FROHMAN et al. v. WILLIAM MORRIS, Inc., et al.

(Supreme Court, Special Term, New York County.   July 9, 1910.)

1. TRADE-MARKS AND TRADE-NAMES (§ 3*)—NAMES SUBJECT TO APPROPRIA-
TION—DESCRIPTIVE NAMES.
    "Chantecler," as the name of a play in which a barnyard fowl is represented by each part, is not of such a descriptive character as to preclude its exclusive appropriation.
    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 4–7; Dec. Dig. § 3.*]

2. TRADE-MARKS AND TRADE-NAMES (§ 75*)—UNFAIR COMPETITION—USE OF
NAME.
    The presentation of a burlesque under the name of "Chanticlair" may be enjoined by the owner of the play "Chantecler," on ground that the presentation of the burlesque under such name tends to deceive the public.
    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 86; Dec. Dig. § 75.*]

3  TRADE-MARKS AND TRADE-NAMES (§ 73*)—UNFAIR COMPETITION—USE OF
NAME.
    That the play entitled "Chanticlair" was produced in Europe by the persons from whom defendant obtained their rights before the play "Chantecler," of which the play produced by defendants is a burlesque, is not a defense to a claim for injunction against the burlesque; reports of the character of the play "Chantecler" having preceded its actual production.
    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 73.*]

Action by Charles Frohman and others against William Morris, Incorporated, and another.  Heard on a motion for an injunction pendente lite.  Granted.

Dittenhoefer, Gerber & James (David Gerber and I. M. Dittenhoefer, of counsel), for the motion.

Jerome Wilzin (David Leventritt, of counsel), opposed.

GIEGERICH, J.  The plaintiffs have acquired from the author the sole right to produce the play "Chantecler" in English in the United States, and intend so to produce it in October, 1910, having made elaborate and expensive preparations for such production, including

---

the engagement of players of the highest rank. The play was first produced in February, 1910, in the city of Paris, France, in the French language. It has never been produced in this country in any language. It was copyrighted in this country on the 2d day of April, 1910. The author of the play is Edmond Rostand, one of the most famous writers of the day, who has produced other plays of conspicuous merit and success. For several years prior to the first production of the play, which took place in Paris in February, 1910, its title and subject-matter, particularly the fact that every character was to represent a barnyard fowl or animal, had been published and announced, and the subject of the play and its peculiar ideas had been constantly and widely discussed in the French and European press. In the month of August, 1909, a dramatic piece in the nature of a burlesque was produced in Paris under the name "Chanticlair" and ran for some weeks. It was afterwards produced in Vienna from February 4, 1910, to April 24, 1910. Thereafter the defendant William Morris acquired by purchase the sole right to produce the piece "Chanticlair" in the United States, and it is now being produced at a theater in this city which is conducted and operated by the defendant William Morris, Incorporated. Upon the argument the plaintiffs withdrew their demand for an injunction against the continued performance of the piece itself, but they insist that the defendant should be enjoined from producing it under the name "Chanticlair."

A large amount of space and attention is given in the affidavits and in the briefs to the question whether or not the word "Chantecler," of which the word "Chanticlair" is another form, the meaning being the same in either case, is susceptible of exclusive appropriation by any writer to designate a play, or whether it is a descriptive term which must be left open to all. Upon this point I have no hesitation in reaching the conclusion that the word as applied to the play in question is not of such a descriptive character as to preclude its exclusive appropriation. Selchow v. Baker, 93 N. Y. 59, 45 Am. Rep. 169; Waterman v. Shipman, 130 N. Y. 301, 29 N. E. 111; Menendez v. Holt, 128 U. S. 514, 9 Sup. Ct. 143, 32 L. Ed. 526; Estes v. Williams (C. C.) 21 Fed. 189; Aronson v. Fleckenstein (C. C.) 28 Fed. 75. The rule to be deduced from the foregoing and other cases which might be cited is thus stated in 28 Am. & Eng. Enc. Law (2d Ed.) pp. 370, 371, 373, 384:

"Every one is entitled truly to describe his goods, and may use the common and appropriate terms to do so. * * * Words or names which simply indicate the quality or character of the goods to which they refer are as a rule words which others may employ for the same purpose with equal truth, and hence cannot be exclusively appropriated by any one at a trade-mark. * * * Words or marks merely indicating superior excellence, popularity, or universality in use, such as 'best,' 'favorite,' etc., cannot be exclusively appropriated as a trade-mark. * * * The name of a drama or other theatrical production not published as a book cannot, of course, constitute a trade-mark; but it is a trade-name, and will be protected against unauthorized use or imitation amounting to unfair competition."

In the light of these principles, it is evident that no one can appropriate a trade-mark or title which describes the thing to which it is affixed. Thus, no one could appropriate the word "play," or "dra-

matic composition," "comedy," "farce," "tragedy," or any similar word in connection with a stage production, because it describes the thing itself. But "Chantecler" is not descriptive. It should rather be deemed fanciful. It does not mean a play or stage production, nor does it convey any adequate or approximate idea of the particular production to which it is applied. It is merely the French name for one character. In both productions the characters all represent barnyard animals, either birds or quadrupeds, and all the characters are costumed in accordance with the particular bird or quadruped represented including the rooster, peacock, owl, turkey, dog, cat, chickens, hen, and rabbit; the imitation of each animal being as close and lifelike as possible in the case of the plaintiffs' play, while in the case of the defendants' the imitation is not attempted to be so complete, portions of the figures of the actors in the latter case being in some instances left without such imitation costuming. In either case I am unable to see that the word "Chantecler" is essentially descriptive of such a play; although the principal character be a rooster. The cases of Barrett Chemical Co. v. Stern, 176 N. Y. 27, 68 N. E. 65; Koehler v. Sanders, 122 N. Y. 65, 25 N. E. 235, 9 L. R. A. 576; Cooke & Cobb v. Miller, 169 N. Y. 475, 62 N. E. 582; Isaacs v. Daly, 7 Jones & S. 511; Ball v. Broadway Bazaar, 121 App. Div. 546, 106 N. Y. Supp. 249, as modified in 194 N. Y. 429, 87 N. E. 674; Lavanburg v. Pfeiffer, 23 Misc. Rep. 577, 52 N. Y. Supp. 801, and others cited by the defendants—come directly or indirectly within the rule above stated.

Many propositions of law are elaborately discussed in the able briefs presented; but I base my conclusion that an injunction should issue upon the ground that upon the situation shown in the affidavits the public will be deceived and misled if two performances under the same name, each having as its characters barnyard animals, are produced simultaneously in this city. It may be, as stated in the opposing affidavits, that the character of the two performances is wholly different, the one being serious and artistic, while the other is a burlesque; and it is also doubtless true that no one intending to witness the plaintiffs' play could possibly mistake the defendants' performance for it. But this power to distinguish would not save the playgoer who had gotten into the wrong theater. His money would have been paid and his evening would have been irretrievably lost. It is manifest, also, that confusion and errors would arise in ordering and purchasing tickets in advance, and that great vexation, inconvenience, and loss would come to the general public from the concurrent production of two such plays under the same name.

On behalf of the defendants, it is argued that the first actual production of the play under the name in question was made by persons in Europe, from whom the defendants have obtained their right; but I cannot regard this circumstance as conclusive upon the rights of the parties. At the time such production was made, and for months and years before that, the fact that Mr. Rostand had written a play under this title and was about to produce it, and the general character and plan of the play, had become well known to the public in

Europe and elsewhere, and owing to the eminence of the playwright and the success of his former productions, and the unique character of his latest effort, the interest in the forthcoming performance was widespread and intense. No claim is made in the opposing affidavits that the title "Chanticlair" was not adopted by the author of the defendants' play with full knowledge of what Mr. Rostand had done. Under such circumstances, I do not think it should be held that the one who was prior in time of actually producing something upon the stage is stronger in right. In equity the right belongs to the eminent author whose talent· and reputation created the extraordinary interest of which the defendants and their assignors have· sought to reap the benefit.

In the recent case of Outcault v. Lamar, 135 App. Div. 110, 118, 119 N. Y. Supp. 930, in passing upon the question of the right to use the words "Buster" and "Buster Brown," the court said:

"The theory of the complaint is that the cartoonist invented this title and these names, and that he and his associates were the first to use them in connection with a public play, and that a court of equity should protect them in that use upon the principles upon which trade-names and trade-marks are protected by the courts, notwithstanding the fact that they are used in connection with a copyright or a patent. Munro v. Tousey, 129 N. Y. 38 [29 N. E. 9, 14 L. R. A. 245]; Waterman v. Shipman, 130 N. Y. 301 [29 N. E. 111]; Potter· v. McPherson, 21 Hun, 559. It seems quite clear, therefore, that the complaint presented a case of which the courts of this state have jurisdiction and over ̀ which the federal courts have no jurisdiction, excepting upon appropriate allegations of diversity of citizenship, which would be a ground· for removing the case from the state court, but not for the state court to decline jurisdiction."

So in this case, as I view it, there is no question of copyright. It is a well-established principle that the public is entitled to protection, even to the extent of enjoining a man from using his own name in his own business, if he uses it in a manner calculated to mislead the public. Higgins & Co. v. Higgins Soap Co., 144 N. Y. 462, 39 N. E. 490, 27 L. R. A. 42, 43 Am. St. Rep. 769, and cases cited.

Upon the doctrine of unfair competition and the broad equitable principle of protecting the public and the one who has the prior right to the use of a name, my conclusion is that the injunction asked for should be granted to the extent of enjoining the defendants from using the title "Chantecler" or "Chanticlair" as the title of this stage production. This will in no way interfere with the performances of the play under the title "The Barnyard Romeo," which it is stated in the briefs the defendants are now and have for several weeks been giving.

Motion granted to the extent indicated, with $10 costs. The amount of the undertaking which will be required as a condition to the granting of a preliminary injunction will be fixed when the order to be entered hereon is presented for settlement, at which time briefs with respect to this point may be submitted.