[Civ. No. 15745. Second Dist., Div. Three. Dec. 10, 1947.]

STANLEY JOHNSTON et al., Respondents, v. TWEN-
TIETH CENTURY-FOX FILM CORPORATION (a
Corporation), Appellant.

798

Alfred Wright, Harold F. Collins and Gordon Hall, Jr., for Appellant.

Harry E. Sokolov and Nathan E. Gillin for Respondents.

VALLÉE, J. pro tem.—Appeal by defendant from a judgment for plaintiffs in an action to recover damages for the breach of an oral agreement granting defendant the

right to the exclusive use of the title, "QUEEN OF THE FLAT TOPS," for all purposes except the right of plaintiffs to continue to use the title in connection with the publication of a book.

Stanley Johnston, referred to as the "author," was on the aircraft carrier Lexington in the battle of the Coral Sea in May, 1942. Shortly thereafter he wrote a book entitled, "QUEEN OF THE FLAT TOPS," subtitled, "The U. S. S. Lexington And The Coral Sea Battle." The book was published and copyrighted in the United States in 1942 by E. P. Dutton & Company, Incorporated, referred to as "Dutton." It was one of the first books published to treat in detail of the activities of an aircraft carrier and its crew in combat. The book is nonfictional. It relates historical facts, warfare in the Pacific. It does not contain any fictional character or characterization as such, or any plot or theme. The author and Dutton at all times have been the owners of the book referred to in the record as the "literary property," and of the copyright. The book became widely known as "QUEEN OF THE FLAT TOPS." It attained considerable popularity which endowed the title, "QUEEN OF THE FLAT TOPS," with considerable value. Up to April 14, 1944, Dutton had sold 170,578 copies of the book throughout the world and had expended the sum of $14,669.71 in advertising and publicizing the book. A substantial number of copies of the book were sold in California. About October, 1942, the author and Dutton employed Myron Selznick Agency, referred to as "Selznick," to vend motion picture rights in the book. Hugh King, acting as "motion picture literary agent" for Selznick, endeavored to effect a sale, contacting all motion picture companies. King was in exclusive charge of the efforts to sell. Early in 1944, appellant was engaged in the production of a motion picture centered about the operations of an aircraft carrier. The picture, like the book, related to historical facts, warfare in the Pacific. In March or April, 1944, Zanuck, executive vice-president of appellant in charge of production, empowered to make contracts in its behalf, authorized Julian Johnson, appellant's story editor, to purchase the right to the title, "QUEEN OF THE FLAT TOPS." Johnson contacted King, and on behalf of appellant offered $2,500 for the use of the title alone, telling King that appellant was only interested in buying use of the title. This offer was re-

jected by King. After some negotiation, the amount of the offer increasing each time, Johnson, upon authorization of Zanuck, offered King $20,000 for use of the title alone. King told Johnson that that was a fair price and that he would recommend to his principals, respondents, that they accept the offer. In his negotiations with King, Johnson used "the term 'all rights' and I meant all rights universally in the various countries." King did not, at that time, have any authority from his principals to accept an offer. It may be inferred from the evidence that, between the $2,500 offer and that of $20,000, Johnson was in constant contact with Zanuck with respect to the amount to be offered. On April 11, 1944, King telegraphed Dutton to the effect that appellant had offered $20,000 for use of the title alone, the material in the book to remain the author's property. On April 12, Dutton telegraphed King to the effect that it would check with the author immediately regarding the offer. On April 13, the author wrote King to the effect that Dutton and he had agreed that the price was acceptable and authorized King to accept the offer. The letter stated that Dutton was contacting King separately. On April 14, the author telegraphed King to the effect that he had spoken with Dutton and that they were in agreement to sell the title for $20,000. Immediately upon receipt of this telegram and on April 14, 1944, King telephoned Johnson, at appellant's studio, and told him that the author and Dutton accepted the offer. Johnson replied, "Thank God, it's over." King then dictated an office memorandum, "the blue memo, which meant the closing of the deal." The same day King went to Johnson's office, at appellant's studio, and verbally confirmed his telephone conversation, thanked Johnson for the deal, each party telling the other that he had made a good deal at a fair price, Johnson asking King in whose name the contract would be drawn. At that conversation King said, "You bought the title only; why don't you buy the whole book and buy the material too?" Johnson replied that their only interest was in the title and "that they didn't want the material." Johnson testified that at that time he regarded the deal "as a good deal for the company and for the author and publisher," and that the title "had a distinct value because Stanley Johnston had written a book giving the saga or story of

the 'Lexington.' " On the same day, April 14, Johnson signed and sent to Schreiber, an officer of appellant authorized to make contracts in its behalf, a writing, reading:

"SUBJECT QUEEN OF THE FLAT-TOPS
(Title purchased)

Through the Myron Selznick Agency (Hugh King representing) we have just purchased all rights to the title of this book. Price, $20,000, which was the figure of our offer— as we discussed the other day.

This is a book published by E. P. Dutton, written by Stanley Johnston.

Mr. Wasson should know, in closing his contract, that we purchased the title only. (We were not interested in the literary material)

I have not notified anyone of this purchase, except Mr. Zanuck."

On April 17, Schreiber signed and sent to Wasson, resident studio counsel of appellant, the following:

"SUBJECT QUEEN OF THE FLAT TOPS Title

Dear George:

We have purchased all the rights to the title of the book, QUEEN OF THE FLAT TOPS, for the price of $20,000. We were not interested in the property, but Mr .Zanuck wanted us to purchase the title only.

Lew Schreiber
Lew Schreiber

Dear George: When the papers are ready
 will you please contact Hugh King
 of the Myron Selznick Agency."

Upon receiving this writing from Schreiber, Wasson telephoned Johnson and, in his own handwriting, wrote on the same writing, the following: "J. Johnson says: Sellers retain no rights to title for mo. pic. [motion picture], telev. [television], radio or dramatic purposes. Stanley Johnston, author—Dutton." On the same day, Wasson told Ferguson, an employee in the legal department of appellant, to prepare a contract and that the contract should contain a "waiver of similarity"—a covenant "not to sue re similarities." On April 17, Ferguson telephoned King asking in whose name the contract should be drawn. On April 17, King telegraphed Dutton, "Closed at Twentieth Friday

on 'Queen.' In whose name should contracts be drawn? Wire.'' The same day Dutton telegraphed King that the contracts should be drawn in the names of the publisher and the author. King so informed Ferguson. On April 17, Wasson telegraphed Kilroe, a copyright searcher for appellant in New York, asking Kilroe to register the title with the Hays Office, saying that appellant proposed to use the title for a picture formerly entitled, ''Wing and a Prayer.'' The Hays Office was the office of the ''Motion Picture Producers and Distributors of America.'' On April 25, Kilroe sent a telegram to Wasson, in which he said that ''Dutton states deal has been closed through Selznick's office.'' On May 2, Ferguson sent Selznick four copies of a written contract. The proposed written contract transferred to appellant all of the right, title and interest of the author and Dutton in the title, ''QUEEN OF THE FLAT TOPS,'' including, but not limited to, ''the motion picture, radio, dramatic, television and allied rights throughout the world, provided however, that the owners shall have the right to continue to utilize said title in connection with the publication of said literary property,'' without any obligation on appellant to exercise or put to use any of the rights acquired, for a consideration of $20,000. The proposed contract also contained provisions which are referred to in the record as ''covenant of nonsuit.'' This ''covenant of nonsuit'' constituted a waiver by respondents of all claims, present or future, against appellant, its successors, licensees and assigns ''by reason of any similarity which may exist between any dramatic production, television production, radio broadcast, motion picture or pictures, including a remake, reissue or foreign language version thereof utilizing the title 'Queen of the Flat Tops' . . . and the literary property hereinbefore mentioned and described,'' and required the author and Dutton to obtain a similar waiver from anyone to whom they might sell the motion picture, dramatic, radio or television rights in the literary property itself, exclusive of rights in the title. Under the terms of the ''covenant of nonsuit'' appellant could, with impunity, make use of any of the material in the book it desired. Wasson testified that his idea in inserting the ''covenant of nonsuit'' in the contract was to put the risk of pirating by appellant from the book itself on respondents and not on appellant. A few days after receipt of the contract by

King, one or more conferences were had between King, Ferguson and Wasson, at one of which Johnson was present. King insisted that the "covenant of nonsuit" be deleted from the contract insofar as it related to the material in the book; that appellant had bought rights in the title only; that it had not purchased "the literary property"; that purchase of the "literary property" had never been discussed; and that appellant had no right to inject such a clause into the contract. Wasson insisted that the covenant remain in the contract. At the meeting at which Johnson was present, Johnson conceded that appellant had only purchased rights in the title and not any of the material in the book. Neither Wasson nor Johnson made any claim that appellant "had bought anything other than the title to the book." Wasson told King that either the "covenant of nonsuit" stayed in the contract or he would recommend to appellant's officers that the deal be called off. King would not agree to its remaining. Wasson then conferred with Zanuck and Schreiber. Wasson told King, on May 11, 1944, "I have got bad news . . . you ain't got no deal," and asked him to return the copies of the proposed contract. King told Wasson that so far as he, King, was concerned, "they had made a deal and they were going to stick by it." King returned the copies of the proposed contract to Wasson on May 12. On May 11, King advised the author and Dutton, by telegram, of appellant's insistence upon the insertion of the "covenant of nonsuit" in the contract and of its effect, that he had refused to accept the contract, and recommended that they not sign the contract as submitted. On May 13, Dutton telegraphed King saying, "We agreed to accept their price for the title alone" and appellant should be "made to stick to the deal." On May 15, the author telegraphed King. "Agree with McCrae [Dutton] that we should insist Fox carry through deal." The evidence also shows that acquisition of the right to use the title of a book divorced from any material in the book is a common and usual transaction in the motion picture industry; that titles are of such value in the industry that Motion Picture Producers and Distributors of America maintains an elaborate system for their registration; that motion picture companies often purchase a title and the literary property with which it is connected in order to obtain use of the title only, without using the literary property.

Respondents commenced this suit, alleging that an oral agreement was made on April 14, 1944, by which appellant had agreed to buy from respondents, and respondents had agreed to sell to appellant, the right to the use of the title, "QUEEN OF THE FLAT TOPS," for motion picture and all other purposes except that respondents should have the right to continue to use the title in connection with the publication of the book, breach of the agreement by appellant, and damage to respondents in the sum of $20,000.

The trial court, among other things, found that respondents are and were at all times the sole owners of the literary work entitled, "Queen Of The Flat Tops, The U. S. S. Lexington and the Coral Sea," and the copyright thereon; that "as of and prior to April 14th, 1944, the title, 'Queen of the Flat Tops' had acquired a secondary meaning with which the use of said title by others than plaintiffs for motion picture, radio, dramatic or television productions or uses would unfairly compete"; that on or about April 14, respondents and appellant, through their respective agents duly authorized and empowered to so contract on behalf of their respective principals, entered into an oral contract, all of the essential terms of which were then and there mutually understood and agreed upon, whereby appellant agreed to buy from respondents and respondents agreed to sell to appellant for a consideration of $20,000, the right to the exclusive use of the title, "QUEEN OF THE FLAT TOPS," for all purposes of any and every nature, subject only to the reservation of the right of the respondents to continue to use said title in connection with the publication of said literary work; that it was the mutual intention of the parties to be, and they were, bound by said oral contract of April 14, 1944, as of the time of the making thereof, although the said oral contract was subsequently to be reduced to writing; that respondents at all times have been ready, willing and able to perform their part of the contract; that appellant had refused to perform the contract unless the respondents, as an express condition of the appellant's performance, "would in writing agree to waive all claims and covenant not to sue defendant in the event that any similarity should exist between any motion picture, radio, dramatic or television production by defendant utilizing said title, 'Queen of the Flat Tops', and the material contained in the plaintiffs' literary work hereinbefore referred to, which

condition the Court finds to be contrary to the terms of said oral contract of April 14th, 1944, and therefore unwarranted, and finds defendant's insistence thereon as a condition to its performance to be a breach of said contract and a repudiation thereof, and finds that the refusal on plaintiffs' behalf to consent to such condition was justifiable''; that ever since April 14, 1944, appellant had failed and refused to perform and had breached the oral contract and had failed to pay respondents the purchase price; that respondents had been damaged in the sum of $20,000 with interest; that ''the agreement by plaintiffs to grant to defendant the rights as aforesaid to the use of the title 'Queen of the Flat Tops' constituted an agreement by plaintiffs both to confer upon defendant a benefit to which defendant was not lawfully entitled and to suffer a prejudice which plaintiffs were not lawfully bound to suffer and that such an agreement constituted a good consideration for defendant's promise to pay $20,000 for such rights.''

Appellant urges first that there was no consideration for its promise to pay $20,000 because, so it says, respondents ''had no vendible property right in the words 'QUEEN OF THE FLAT TOPS' which they could lawfully transfer to'' appellant. Appellant says in this behalf that there is no element of property in a literary title or name capable of being transferred separate and apart from the literary work to which it is appended.

Appellant takes the position here inconsistent with, and contrary to, that which it took in the trial court. There it said: ''In the instant case, the contemplated contract was for the sale of a part of a literary property. There is an enormous traffic in literary properties, especially in the motion picture industry. Hundreds of law suits involving literary properties have found their way into court. However, we have been unable to discover any reported case dealing with the sale of rights in literary property founded upon an oral contract. . . . Though there are conflicting dicta on the subject, it has long been held that there is a property right in a trade mark or trade name . . . the Supreme Court of California, in *Derringer* v. *Plate* (1865) 29 Cal. 292 [87 Am.Dec. 170], holds that a man may acquire, by adoption and use, a property right in a trade name. It has long been recognized that titles to literary and dramatic works are analogous to trade names and are governed by the same principles. *Outcault* v. *Lamar*

(1909) 135 App.Div. 110; 119 N.Y.S. 930; *Dickey* v. *Mutual Film Corp.*, (1916) 160 N.Y.S. 609. Referring to the nature of a title, it was said in *National Pictures Theatres, Inc.*, v. *Foundation Film Corp.*, (CCA (2d) 1920) 266 F. 208, that it is 'a right in being, an actual property' protectible against invasion. . . . We apprehend that it will be urged that trade marks and trade names are not vendible in gross, and that, therefore, there was no sale within the meaning of the Sales Act. If this be so, there was a total failure of consideration for defendant's alleged promise to pay $20,000. However, we think the proper view is that business practice has so developed, and the law must recognize, that certain names and titles have a marketable value and are the subject of commercial traffic. In *Benioff* v. *Benioff* (1923) 64 Cal.App. 745 [222 P. 835], the court recognized that the owner of a trade name could grant the exclusive right to another to use it in another locality, although the court held that since no consideration was paid for the right, and since it was not acted upon by the defendant, that it was revocable at plaintiff's pleasure.''

It would be sufficient for us to say that appellant, upon appeal, cannot deviate from the position it took in the trial court. (*Merchant etc. Assn.* v. *Kellogg E. & D. Co.*, 28 Cal.2d 594, 601 [170 P.2d 923]; *Ayoob* v. *Ayoob*, 74 Cal.App.2d 236, 247 [168 P.2d 462], where it was held that the respondent could not claim illegality of consideration upon appeal when he claimed in the trial court that an oral contract was voidable under the statute of frauds and had not claimed illegality of consideration.) As a special defense, appellant pleaded want of consideration for the oral agreement. It vigorously asserts that it did raise the question of the transferability of the title in the trial court. We are inclined to the opinion that it did not raise that question or the question of the transferability of a right to use the title. However, in view of appellant's insistence that it did raise the question of the transferability of the title in the trial court, and that it did plead want of consideration, and of the importance of the question, we pass on appellant's contention.

It may be well to emphasize here that what respondents, in fact, granted to appellant, as found by the trial court, was not the title but the exclusive right to use the title for all purposes except in connection with the publication of the book. The author of any product of the mind has an exclusive ownership therein and in the representation or expression

thereof which continues so long as the product and the representations or expressions thereof made by him remain in his possession. (Civ. Code, § 980.) There may be ownership of such products of labor or skill as the composition of an author and of rights created by statute. (Civ. Code, § 655.) The ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others. The thing of which there may be ownership is called property. (Civ. Code, § 654.) The ownership of property is absolute when a single person has the absolute dominion over it and may use it or dispose of it according to his pleasure subject only to general laws. (Civ. Code, § 679.) A product of the mind is property. (16 Cal.Jur. 665; 21 Cal.Jur. 642, § 4.) It is an intangible, incorporeal right. (*Italiani* v. *Metro-Goldwyn-Mayer Corp.*, 45 Cal.App.2d 464 [114 P.2d 370].) There cannot be property in an author's ideas but there may be property in a particular combination of ideas or in the form in which ideas are embodied. (*Barsha* v. *Metro-Goldwyn-Mayer*, 32 Cal.App. 2d 556 [90 P.2d 371]; 18 So.Cal.L.Rev. 256.) There can be no property in words which are merely generic or descriptive. (*Fidelity etc. Co.* v. *Federal etc. Co.*, 217 Cal. 307 [18 P.2d 950]; *Jaynes* v. *Weickman*, 55 Cal.App. 557, 558 [203 P. 828].) However, a person may have a property right and the right to the exclusive use of arbitrary or fictitious or fanciful or artificial or technical names or titles. They have a special significance. They are creations of the mind. Words which are generic and descriptive in their ordinary application may, when not used in a generic or descriptive sense, be the subject of a property right and the right of exclusive use. Words and terms, such as "Mechanics," "What Cheer House," "Philadelphia," "Hudson Bay," "Carolina," while generic and descriptive in their ordinary application may, when not used in their generic or descriptive sense, be the subject of a property right and the right of exclusive use. (*Rosenthal* v. *Brasley-Krieger S. Co.*, 19 Cal.App.2d 257, 259 [64 P.2d 1109].) A word or combination of words may be descriptive when used in one connection, and nondescriptive in other contexts. A descriptive word or combination of words may be used in a nondescriptive sense because unrelated to the subject matter in question. In *Gannert* v. *Rupert*, (2 Cir.) 127 F. 962 [62 C.C.A. 594], the word "Comfort," as the title of a magazine, was held to be technical and nondescriptive and entitled to protection as against the title "Home Comfort" of another

magazine. The following have been held nondescriptive: "Chantecler," as applied to a play in which every character represented a barnyard fowl or animal, even though the principal character was a rooster. (*Frohman* v. *Morris*, 68 Misc. 461 [123 N.Y.S. 1090, 1092]; "Chicken of the Sea," for canned tuna fish (*Van Camp Sea Food Co.* v. *A. B. Stewart Organizations*, 50 F.2d 976, 979); "Cough Cherries," for a confection of a reddish color and a cherry flavor (*Stoughton* v. *Woodard*, 39 F. 902); "Kaiser," for beer (*J. & P. Blatz Brewing Co.* v. *Kaiserbrauerei, Beck & Co.*, (3 Cir.) 74 F. 222, 224 [20 C.C.A. 402]); "Pride," as applied to cigars (*Hier* v. *Abrahams*, 82 N.Y. 519, 522 [37 Am.Rep. 589]); "Royal," for baking powder (*Royal Baking Powder Co.* v. *Raymond*, 70 F. 376, 382 [aff'd, (7 Cir.) 85 F. 231, 236, 29 C.C.A. 245]); "Star," for hams and bacon (*Armour & Co.* v. *Louisville Provision Co.*, (6th Cir.) 283 F. 42, 45 [cert. den., 260 U.S. 744, 43 S.Ct. 164, 67 L.Ed.492]); "The Rosary," as applied to a drama as such (*Selig Polyscope Co.* v. *Unicorn Film S. Corp.*, 163 N.Y.S. 62); "Queen," for shoes (*Thomas G. Plant Co.* v. *May Co.*, (6 Cir.) 105 F. 375, 378); "Queen Quality," for shoes (*Thomas G. Plant Co.* v. *May Mercantile Co.*, 153 F. 229). ■ In our opinion, the title "QUEEN OF THE FLAT TOPS," is an arbitrary, fictitious, fanciful, artificial, distinctive and nondescriptive combination of words. The words "FLAT TOPS" alone are descriptive. For a long time aircraft carriers have been referred to commonly as "flat tops." The word "QUEEN" may be descriptive. It is ordinarily not descriptive of an aircraft carrier. Some of the synonyms and ordinary meanings of "queen" are: "wife of a king," " a female monarch," "a goddess," "an empress," "a belle," "a woman eminent in rank, power or attraction," "a strikingly attractive girl or woman," "the fertile female of bees, ants and termites," "a female cat," "a playing card." No one of these would be used normally to describe an aircraft carrier. The combination of words, "QUEEN OF THE FLAT TOPS," is purely fanciful. It suggests one flat top. Which one is not disclosed. The title, "QUEEN OF THE FLAT TOPS," being nondescriptive, was a product of the mind. Under Civil Code, sections 655 and 980 respondents were the owners of the title and as such owners had the right to its exclusive use for all purposes. (Civ. Code, §§ 654, 679.)

■ At common law an author has an exclusive property right in his original intellectual production before it is

published. (Drone, "Copyright," p. 101.) The common law right is an absolute, incorporeal property right. It is not a privilege conferred by statute. It is a right of the common law wherever that system prevails. (*Ferris* v. *Frohman*, 223 U.S. 424 [32 S.Ct. 263, 56 L.Ed. 492]; *Brunner* v. *Stix, Baer & Fuller Co.*, 352 Mo. 1225 [181 S.W.2d 643].) ■ An idea given embodiment in tangible form is the subject of common law property right. (*Barsha* v. *Metro-Goldwyn-Mayer*, supra, 32 Cal.App.2d 556, 561; *Yadkoe* v. *Fields*, 66 Cal.App.2d 150, 159 [151 P.2d 906]; *Brunner* v. *Stix, Baer & Fuller Co.*, supra; *Liggett & Myers Tobacco Co.* v. *Meyer*, 101 Ind.App. 420 [194 N.E. 206, 210].) ■ The copyright of the book does not protect the owner's exclusive use of the title. (*Warner Bros. Pictures* v. *Majestic Pictures Corp.*, (2 Cir.) 70 F.2d 310, 311.) A title alone is not copyrightable. (*Patten* v. *Superior Talking Pictures*, 8 F.Supp. 196, 197.) ■ Upon publication of the book with the title the owners ceased to have an exclusive common law right to use of the title. (*Little* v. *Hall*, 18 How. 165 [15 L.Ed. 328]; *Keene* v. *Kimball*, 16 Gray (Mass.) 545, 550 [77 Am.Dec. 426]; *Palmer* v. *DeWitt*, 47 N. Y. 532, 539 [7 Am.Rep. 480].) While an author may not have any property interest in the use of a title under his common law right after publication, it does not follow that he does not have a property interest in the title and in its use as against a competitor. (*International News Service* v. *Associated Press*, 248 U.S. 215 [39 S.Ct. 68, 63 L.Ed. 211, 219, 2 A.L.R. 293].) ■ To protect the author in his property right to the title and its use after publication of the work, the courts have developed the doctrine of secondary meaning. " 'Secondary meaning' is a legal term which deals with the significance, in law, of extensions of the meaning of words and symbols to new uses." (Nims, Unfair Competition and Trade-Marks, 4th ed. (1947), p. 152.) ■ A title of a copyrighted book attains a secondary meaning if it acquires a trade significance as an arbitrary designation, and its use is secured to the owner of the copyrighted matter. (*Selig Polyscope Co.* v. *Unicorn Films Corp.*, supra, 163 N.Y.S. 62, 63.) Acquiring a secondary meaning signifies attaining popularity. (*G. & C. Merriam Co.* v. *Saalfield*, (6 Cir.) 198 F. 369, 373 [117 C.C.A. 245].) The doctrine of secondary meaning has been extended to catch phrases and slogans. (*H. W. Fishel & Sons* v. *Distinctive Jewelry Co.*, 196 App.Div. 779 [188 N.Y.S.

633, 639]). The title of a radio program is subject to ownership, and right in it is established by proof that it has been used in radio broadcasts, has been announced and advertised and has reached the public in other ways. (Old Maestro," *Premier-Pabst Corp.* v. *Elm City Brewing Co.*, 9 F.Supp. 754; "The March of Time," *Time, Inc.* v. *Barshay*, 27 F.Supp. 870, 873; "Information Please," *Golenpaul* v. *Rosett*, 174 Misc. 114 [18 N.Y.S.2d 889].) The title of a newspaper, magazine or periodical is subject to ownership, and right in it is established by proof of circulation and advertising of the name, although it is not registered as a trademark; "Comfort," *Gannert* v. *Rupert, supra,* (2 Cir.) 127 F. 962; "Photoplay," *Photoplay Pub. Co.* v. *La Verne Pub. Co.*, (3 Cir.) 269 F. 730; "Vogue" Magazine, *Vogue Co.* v. *Thompson-Hudson Co.*, (6 Cir.) 300 F. 509; "The Sun," *Powell* v. *Valentine*, 106 Kan. 645 [189 P. 163]; "Suburban Life," *Suburban Press* v. *Philadelphia Suburban Pub. Co.*, 227 Pa. 148, [75 A. 1037].) The title of a play is subject to ownership, and right in it is established by proof of use, advertising under the title, although it is not registered as a trademark and is not a trade name. ("A Fool There Was," *Klaw* v. *General Film Co.*, 154 N.Y.S. 988 [aff'd 171 App.Div. 942, 156 N.Y.S. 1128]; "The Rosary," *Selig Polyscope Co.* v. *Unicorn Film S. Corp.*, *supra,* 163 N.Y.S. 62; "White Zombie," *Amusement S. Corp.* v. *Academy Pictures D. Corp.*, 162 Misc. 608 [294 N.Y.S. 279] [aff'd 250 App.Div. 710, 294 N.Y.S. 305, 306, mod. in part, 251 App. Div. 227, 295 N.Y.S. 436, motions den. 250 App.Div. 749, 295 N.Y.S. 472, aff'd 277 N.Y. 557, 13 N.E.2d 471, rehearing den. 277 N.Y. 672, 14 N.E.2d 383]; "Blind Youth," *National Picture Theatres* v. *Foundation Film Corp.*, (2 Cir.) 266 F. 208.) The title of a book consisting of words of common usage may acquire a secondary meaning. (*National Picture Theatres* v. *Foundation Film Corp., supra; Photoplay Pub. Co.* v. *La Verne Pub. Co., supra,* (3 Cir.) 269 F. 730, 732; *Warner Bros. Pictures* v. *Majestic Pictures Corp., supra,* (2 Cir.) 70 F.2d 310, 311.) The subject of property is the order of words in the author's composition. (*Jeffreys* v. *Boosey*, 4 H.L. 815, 867, 10 Eng.Rep. 681, 702.) When the words "QUEEN OF THE FLAT TOPS," have acquired a secondary meaning it may be said that such meaning is their primary meaning insofar as their use in connection with the activities of an aircraft carrier

are concerned. (*Eastern Columbia, Inc.* v. *Waldman*, 30 Cal.2d 268, 271 [181 P.2d 865].) The facts in *Estes* v. *Williams*, 21 F. 189, were that one James Johnston of London published a series of juvenile books called "Chatterbox"; they became widely known and quite popular in England and in this country; James Johnston did not have a copyright or trademark; *he assigned the exclusive right to use and protect the title "Chatterbox" in this country to Estes, the orator;* defendants began publication in this country of a series of books similar in appearance and style and called them "Chatterbox." In enjoining the use by the defendants of the title "Chatterbox," the court said (p. 190) : "Johnston had the exclusive right to put his own work, as his own, upon the markets of the world. No one else had the right to represent that other work was his. Not the right to prevent the copying of his, and putting the work upon the market, but the right to be free from untrue representations that this other work was his when put upon the markets. This gives him nothing but the fair enjoyment of the just reputation of his own work, which fully belongs to him. It deprives others of nothing that belongs to them. The question then arises whether Johnston could transfer his right, or any part of it, to the orators, so that the defendants, in what they have done and are about to do, trespass upon the orator's rights, and not upon Johnston's. He could not do all this himself; he must act by and through others. No reason is apparent why he could not give them the exclusive right to put his work on the market as his, as he had that right. This seems to be what he undertook to do. They had that right, and the profits of its enjoyment would belong to them. The defendants would deprive them, and not Johnston, of the profits. The injury would be to them and not to him, and they are, in this view, entitled to the remedy." (See, also, *Estes* v. *Leslie*, 27 F. 22, and *Estes* v. *Worthington*, 31 F. 154, in each of which the transferee of the right to use the title was awarded an injunction against the use of the title "Chatterbox.") The court, in *Hemingway* v. *Film Alliance of U. S.*, 174 Misc. 725 [21 N.Y.S.2d 827], held that the title of a play, "The Fifth Column," had acquired a secondary meaning although it had only run on Broadway for two and one-half months, having opened elsewhere, and had only enjoyed "some measure of success"; that exhibition of a motion picture titled, "Fifth Column Squad" should

be enjoined. The court said (p. 829) that even if the title "Fifth Column" had not acquired a secondary meaning "to paraphrase the opinion in *Skelly Oil Co.* v. *Powerine Co.*, Cust. and Pat. App., 86 F.2d 752, 754, quoted with approval in *Philadelphia Storage Battery Co.* v. *Mindlin*, 163 Misc. 52, 56, 57 [296 N.Y.S. 176], a vast field of words and phrases is open to a producer who wishes to seek a title to distinguish his play or photoplay from that of another. Consequently, whatever doubts there may be on that score should be resolved in favor of the producer who has already spent time, money and effort to give the title to his production a secondary meaning and against the new comer who, even unintentionally, uses or simulates the title in such a manner as to confuse or mislead the public." The question whether a title has acquired a secondary meaning is one of fact. (*Jenney Mfg. Co.* v. *Leader Filling Stations Corp.*, 291 Mass. 394 [196 N.E. 852, 854]; *Little Tavern Shops, Inc.* v. *Davis* (4 Cir.), 116 F.2d 903, 906.) ▮ The evidence recited, showing exclusiveness and priority of use and great popularity, is sufficient to support the finding of the trial court that the title "QUEEN OF THE FLAT TOPS" alone, and divorced from the material in the book, had acquired a secondary meaning. (*Shaler Co.* v. *Rite-Way Products* (6 Cir.), 107 F.2d 82, 84 [cert. den. 310 U.S. 634 [60 S.Ct. 1076], 84 L.Ed. 1403]; *N. S. W. Co.* v. *Wholesale Lumber & Millwork* (6 Cir.), 123 F.2d 38, 43; *Beneficial Ind. Loan Corp.* v. *Kline* (8 Cir.), 132 F.2d 520, 524; *Bill's Gay Nineties, Inc.* v. *Fisher*, 180 Misc. 721 [41 N.Y.S.2d 234].)

Under the statutes of this state, and under the common law, respondents were the owners of the right to the exclusive use of the title. This exclusive use included: its use as the title of the book, as the title of a silent motion picture, as the title of a speaking motion picture, as the title of a radio broadcast, as the title of a dramatic production, as the title of a television production,—dealing with the activities of an aircraft carrier in combat. As owners of these rights, respondents could grant the exclusive right to use the title for any one or more of those purposes. Civil Code, section 1044, provides that "Property of any kind may be transferred, except as otherwise provided by this article." Section 1044 is in article II of chapter I of title IV. The only property which article II says may not be transferred is a "mere possibility, not coupled with an interest." Many items of property are

assignable under Civil Code, section 1044, which were not assignable at common law. (*Fudickar* v. *East Riverside I. Dist.*, 109 Cal. 29, 37 [41 P. 1024].) The common law rights are subject to disposition, absolute or qualified, by any mode by which personal property is transferred. (*Caliga* v. *Inter-Ocean Newspaper Co.* (7 Cir.), 157 F. 186, 188 [aff'd 215 U.S. 182, 30 S.Ct. 38, 54 L.Ed. 150]; *Frohman* v. *Ferris,* 238 Ill. 430 [87 N.E. 327, 328, 128 Am.St.Rep. 135, 43 L.R.A. N.S. 639] [aff'd 223 U.S. 424, 32 S.Ct. 263, 56 L.Ed. 492].) Writing of the common law right, the court in *Aronson* v. *Baker,* 43 N.J.Eq. 365 [12 A. 177, 178], declared: "The right to literary property is just as sacred, and just as much entitled to the protection of the law, as the right to any other kind of personal property. Its acquisition and succession are governed by the same legal rules which control the acquisition and succession of other property of the same general class, and, if the rights of its owner are violated, he is entitled to the same remedies to which the owner of other personal property may resort for redress." In *Goldwyn Pictures Corp.* v. *Goldwyn* (2 Cir.), 296 F. 391, 397, it was squarely held that "one by contract may deprive himself of his exclusive right to use his name in industry." (See, also, *Brown Chemical Co.* v. *Meyer,* 139 U.S. 540, 542 [11 S.Ct. 625, 35 L.Ed. 247, 248].) If an advertising slogan is novel and reduced to concrete form, the originator may recover from one granted permission to use the slogan upon a contract, express or implied. (*Healey* v. *R. H. Macy & Co.,* 251 App.Div. 440 [297 N.Y.S. 165] [Aff'd 277 N.Y. 681, 14 N.E.2d 388]; *Alberts* v. *Remington Rand,* 175 Misc. 486 [23 N.Y.S.2d 892]; *Plus Promotions, Inc.* v. *RCA Mfg. Co., Inc.,* 49 F.Supp. 116; *Brookins* v. *National Refining Co.,* 26 OhioApp. 546 [160 N.E. 97]; *How J. Ryan & Associates* v. *Century Brewing Ass'n,* 185 Wash. 600 [55 P.2d 1053, 104 A.L.R. 1353].) *Liggett & Myers Tobacco Co.* v. *Meyer, supra,* 101 Ind.App. 420 [194 N.E. 206], answers appellant's contention. In that case the plaintiff, Meyer, on December 3, 1925, submitted to defendant, seller of Chesterfield cigarettes, an original advertising scheme to be used in the way of billboard advertising. The idea consisted of this: Two gentlemen, well groomed, in working clothes, or in hunting togs, apparently engaged in conversation, one extending to the other a package of cigarettes saying, "Have one of these," the other replying, "No thanks; I smoke Chesterfields." In submitting the scheme,

by letter, Meyer said that he trusted the idea would "be of sufficient value as to merit a reasonable charge therefor." About two and one-half years later, on July 21, 1928, the defendant used a modification of the advertising scheme in numerous daily papers and magazines. In upholding a judgment for the plaintiff for the reasonable value of the scheme, the court stated (p. 210 [194 N.E.]) : "This is a common-law action. The rules of the common law are continually changing and expanding with the progress of the society in which it prevails. It does not lag behind, but adapts itself to the conditions of the present so that the ends of justice may be reached. While we recognize that an abstract idea as such may not be the subject of a property right, yet, when it takes upon itself the concrete form which we find in the instant case, it is our opinion that it then becomes a property right subject to sale. Of course, it must be something novel and new; in other words, one cannot claim any right in the multiplication table. [Citing cases.]" The judgment was upheld upon the theory that the plaintiff had made an offer to sell a merchantable idea or scheme, the defendant had accepted, and, in the absence of an express agreement to pay, there was a use of the property from which arose an implied obligation to pay. The recent case of *Yadkoe* v. *Fields, supra,* 66 Cal. App.2d 150, was an action to recover the reasonable value of literary material submitted by Yadkoe to and used by W. C. Fields. The court quoted with approval from *Liggett & Myers Tobacco Co.* v. *Meyer, supra,* 101 Ind.App. 420 [194 N.E. 206], and said that while an abstract idea as such may not be the subject of a property right, yet, when it takes upon itself concrete form it then becomes a property right *subject to sale,* that there may be literary property in the form in which ideas are expressed, and that whether an idea is expressed in concrete form is a matter of degree. (See *Bradbury* v. *Dickens* (Eng.), 27 Beav. 53, 54 Eng.Rep. 21, holding that the title of a magazine was the sole valuable asset of the proprietor and authorizing its sale.)

If appellant, before or without the grant of April 14, 1944, had threatened to use or had used the title, "QUEEN OF THE FLAT TOPS" for any purpose, it could have been enjoined. The author is protected from misappropriation by pirates and cheats: (*Golenpaul* v. *Rosett, supra,* 174 Misc. 114 [18 N.Y.S. 2d 889], in which the publisher of a magazine was enjoined from using "Information Please," the title of a radio

program, as the title of a magazine; *Klaw* v. *General Film Co., supra,* 154 N.Y.S. 988, holding that the producer of a play under a certain title was entitled to restrain the production of a dissimilar motion picture under the same title.) (See *Frohman* v. *Payton,* 34 Misc. 275 [68 N.Y.S. 849]; *Frohman* v. *Morris, supra,* 68 Misc. 461 [123 N.Y.S. 1090]; *Dickey* v. *Mutual Film Corp.,* 160 N.Y.S. 609, where the sole similarity was in the title; *Patten* v. *Superior Talking Pictures,, supra,* 8 F. Supp. 196.) Appellant concedes the correctness of this principle when, in its closing brief, it says: ''We further agree that title to a literary work achieves a proprietary aspect as the result of its acquiring a secondary meaning and that, having acquired such meaning, it may not be used in connection with any other work, however dissimilar.'' ▮▮▮ The right to the exclusive use of the title was a right of value. Having that right, respondents could, by agreement for a consideration, waive it in whole or in part. There is nothing unlawful in such an agreement. Appellant argues that the title of a book may not be transferred in gross—that is, apart from the book. The argument overlooks the fact that the agreement between the parties here was not a transfer of the title in gross. Under the agreement the title remained in respondents in connection with the publication of the book. Respondents merely permitted appellant to do something it could not otherwise do—that is, use the title for motion picture and other purposes. These were the findings. It is obvious that the title could only be used for those purposes in connection with the activities of ''Flat Tops,'' aircraft carriers. The title was not transferred.

▮▮▮ Fairly, it may be inferred from the evidence that the contents of the book, the literary material, had lost its value at the time of the transaction between the parties, that the only value was in use of the title. The book, in evidence, is wholly historical. As has been said, it treats largely of the exploits of the carrier Lexington and its crew in the battle of the Coral Sea, which occurred in May, 1942. Selznick was given the agency to sell the book for motion picture purposes in October, 1942. Results were nil up to the time that appellant made an offer for use of the title alone in March or April, 1944. During the negotiations between King and Johnson, King made repeated efforts to persuade appellant to buy the literary material without avail. After appellant acquired the right to use the title Selznick continued its effort to sell the literary material to other motion picture producers without success.

The subject matter of the book was *publici juris,* and, as such, was not protected by the copyright. It was only the manner in which the literary material was set up and the personal reactions of the author which the copyright protected. The fact that the material became valueless was, no doubt, due to the fact that all historical and news events soon lose commercial value as the interest of the public wanes and current news events become the topic of the day and capture the public fancy. The war had progressed about two years between the sinking of the Lexington in the battle of the Coral Sea and the grant to appellant. Numerous exploits of men, aircraft carriers, airplanes and other instruments of war had occurred, been written about, and captured public attention. We cannot say, as a matter of law, that because the literary material probably had lost its value the right to use the title also had lost value and for that reason no consideration passed to appellant. Appellant's officers, at least, thought that the title alone had substantial value.

Property rights exist because they promote the general welfore. As society has developed there has been a corresponding evolution in the development of property rights. Matters considered as near revolutionary a few years ago are now accepted as facts. Legal history shows a continual recognition of new interests and a gradual willingness to protect interests in intangible things. (Warren & Brandeis, 4 Harv. L. Rev. 193; 4 Ford. L. Rev. 307; 45 Yale L. J. 520.) The right of transfer is one of the inseparable incidents of property. A title signifies origin and a certain standard of competence. (*Warner Bros. Pictures* v. *Majestic Pictures Corp., supra,* (2 Cir.) 70 F.2d 310, 311.) The title, "QUEEN OF THE FLAT TOPS," was produced by shrewd calculation. It is an original combination, a catchy phrase. It had sales appeal. Much energy, time and money were spent in popularizing it. A thing of such great value should not only be protected but should be subject to transfer for use. There is no valid reason why it should not be held that a transferable property right exists in use of a title of a book, such as this, for motion picture and other ends. Any other rule would give the owner of the right an empty shell where the literary material, as a book, has lost value. He could prevent another from using the title for such purposes but could realize nothing upon that right unless he was financially and otherwise in a position to use it for such purposes. There is nothing novel, complex or

unique about the transaction. Appellant's studio counsel testified that purchase of the right to use a title divorced from the material with which it has been associated is a most usual transaction in the motion picture industry. We should be realistic. It is common knowledge that since the advent of motion pictures—and particularly since the advent of radio —titles, names, slogans, catch-phrases and the like have become of great value. Agreements for their use in particular fields are common. Large sums are paid for their use in advertising. The law is not quiescent. It progresses. Evolution of the law to meet changing conditions is exemplified by the attitude of our Supreme Court. The earlier cases held that in order to entitle one to an injunction restraining another from using a name or title previously appropriated, a showing had to be made that the name was being used by the infringer in a competing business. In *Academy of Motion Picture A. & S.* v. *Benson,* 15 Cal.2d 685 [104 P.2d 650], it was held that an injunction should issue even though the infringer was using the name in a noncompeting business. The reasoning of the later cases is that use by another of the name or title results in a dilution of its value to the original appropriator. (*Tiffany & Co.* v. *Tiffany Productions*, 147 Misc. 679 [264 N.Y.S. 459] [aff'd 262 N.Y. 482, 188 N.E. 30].) Modern conditions require our conclusion in the instant case. The law is, and should be, molded to meet the changing requirements of the people. As it was held in *Uproar Co.* v. *National Broadcasting Co.,* 8 F.Supp. 358, that the advertising value of an announcer's name (Graham McNamee) is an assignable property right, so it must be held here that respondents had vendible property rights in the right to the exclusive use of the title, "QUEEN OF THE FLAT TOPS," which they could lawfully grant to appellant for motion pictures and other purposes.

The next phase of appellant's argument of want of consideration is that there was no counterpromise on the part of respondents which furnished any consideration for appellant's promise. This is the point which appellant made in the trial court in support of its plea of want of consideration. The point is wholly without merit. The evidence fully supports the trial court's finding that "the agreement by plaintiffs to grant to defendant the rights as aforesaid to the use of the title 'Queen of the Flat Tops' constituted an agreement by plaintiffs both to confer upon defendant a benefit to which

defendant was not lawfully entitled and to suffer a prejudice which plaintiffs were not lawfully bound to suffer and that such an agreement constituted a good consideration for defendant's promise to pay $20,000.00 for such rights.'' Respondents had the exclusive right to the use of the title for all purposes. Appellant had no right to its use for any purpose. Respondents granted appellant the exclusive right to use the title for all purposes except in connection with the publication of the book. This was adequate consideration for appellant's promise to pay $20,000. (Civ. Code, § 1605; *Krobitzsch* v. *Middleton*, 72 Cal.App.2d 804, 809 [165 P.2d 729].) Appellant's assumption, as the premise for its argument in this connection, that there was no ''benefit or prejudice which is offered or assumed as an inducement to the promisor,'' because, so the argument runs, the waiver of respondents of a right which they otherwise would have had to object to appellant's use of the title was not the inducement for appellant's offer to pay $20,000, is contrary to the evidence, inferences which the trial judge could draw therefrom, and the findings. In presenting this point, appellant also argues that while copyright does not protect title, rights with respect to the use of a title must be supported by a copyright and follow it, that, therefore, it lay within respondents' power to destroy the grant ''by letting the book fall into the public domain (as by publishing it without the statutory notice of copyright) or by assigning the copyright to a bona fide purchaser for value.'' Neither appellant's premise nor its conclusion is sound. Rights with respect to the use of a title need not be supported by a copyright. As we have seen, a title alone may acquire a secondary meaning with the right of protection. That right is not dependent upon copyright. Some of the more recent cases cited above hold that a title which is nondescriptive will be protected. That right is not dependent upon copyright. As the learned trial judge pointed out, the agreement carried with it implied obligations upon the part of respondents to fully and adequately protect appellant's use. (See *Uproar Co.* v. *National Broadcasting Co.,* (1 Cir.) 81 F.2d 373, 377.) There is always a possibility in any agreement of one or the other of the parties breaching the agreement whether its covenants are express or implied. Appellant was perfectly willing to take the exclusive use of the title without any express obligation on the part of respondents to refrain from letting the book fall into the public domain,

as by publishing it without the statutory notice of copyright, or by assigning the copyright to a bona fide purchaser for value. Appellant bargained for use of the title only, with the exclusive right to use it as the title of motion pictures, stage performances, radio broadcasts, television broadcasts, and any use whatever throughout the world, except the right in respondents to continue to use it in connection with the publication of the book for so long as such rights existed under the law. Appellant got just what it bargained for. It cannot complain because it did not get more.

Appellant next says that "at no time did the parties consummate a binding contract." It is said, (a) that neither of the negotiating agents was authorized to enter into a binding contract, (b) that even if Johnson made an offer there was no acceptance by Dutton, (c) that the minds of the parties did not meet on essential elements of the proposed contract, (d) that the parties contemplated that any agreement they might reach was to be reduced to writing and until that was done they were not obligated to each other. It is unnecessary to repeat the evidence which we have stated at length. It is without conflict that both negotiating agents were authorized to enter into a binding agreement, and that Dutton accepted appellant's offer. If there was any question whether King had authority from Dutton to accept Johnson's offer, which there was not, it is clear that Dutton ratified King's acceptance before withdrawal of the offer. The same may be said with respect to the contention that the minds of the parties did not meet on essential elements of "the proposed contract." The contention is not that the minds of the parties did not meet upon the essential elements of "a contract." Civil Code, section 1550, says: "It is essential to the existence of a contract that there should be: 1. Parties capable of contracting; 2. Their consent; 3. A lawful object; and, 4. A sufficient cause or consideration." All of these elements were present. Because the agreement did not embody other matters does not affect its validity. Neither is its validity affected because it does not contain provisions which a super-technical lawyer for a motion picture producer would have insisted upon.

The trial court found that the oral agreement of April 14, 1944, was binding on that date, although it was subsequently to be reduced to writing. It has been held repeatedly that when the respective parties orally agree upon all the terms

and conditions of an agreement with the mutual intention that it shall thereupon become binding, the mere fact that a formal written agreement to the same effect is to be prepared and signed does not alter the binding validity of the original oral agreement. (*Thompson* v. *Schurman*, 65 Cal.App.2d 432, 440 [150 P.2d 509] ; *Gibson* v. *De La Salle Institute*, 66 Cal. App.2d 609, 630 [152 P.2d 774] ; *Kreling* v. *Walsh*, 77 Cal. App.2d 821, 834 [176 P.2d 965] ; note: 165 A.L.R. 756.)

█ Whether it was the mutual intention of the parties that the oral agreement should become binding *eo instanti* is to be determined by the surrounding facts and circumstances of a particular case and is a question for the trial court. (*Thompson* v. *Schurman, supra; Kreling* v. *Walsh, supra.*) The entire tenor of the argument of counsel for appellant is that the officers of appellant should not have authorized Johnson to make the agreement, that they should have authorized him only to make an offer—conditioned, if it was accepted, upon the making of a written contract. The argument has no merit. At the time of the grant the war was on. Appellant was producing, and had about completed, an historical motion picture dealing with an aircraft carrier in combat, warfare in the Pacific. Its officers wanted a popular, catchy title for the picture. They were willing to pay $20,000 for it. It is a reasonable inference from the evidence that all they wanted was use of the title for that picture and that they were not, in the slightest, concerned with leaving anything else to future negotiation. The finding that the oral agreement of April 14, 1944, became effective immediately is supported by substantial evidence. Upon King's acceptance of appellant's offer on April 14, 1944, nothing was left to be agreed upon. Indeed, it is difficult to see how any other finding could have been made in the face of appellant's memoranda that it had "purchased all the rights to the title of the book QUEEN OF THE FLAT TOPS."

█ Finally, appellant says that if there was an agreement it was broken through no fault of its own in that respondents refused to execute the written agreement proposed by appellant. This contention is so palpably lacking in merit that it should not be considered. Johnson, appellant's story editor, testified without equivocation that all he purchased was the right to use the title; that he told King, on several occasions, that all appellant wanted was use of the title; that

it did not want any of the material in the book. Notwithstanding, appellant's resident counsel, Wasson, inserted in the written contract a provision giving appellant unqualified right to use the material in the book, the so-called "covenant of nonsuit." King objected. Appellant, through its resident counsel, then refused to go further with the transaction and refused to pay the purchase price. The oral agreement was breached by appellant. (*Gold Mining & Water Co.* v. *Swinerton*, 23 Cal.2d 19, 29 [142 P.2d 22].) The trial court no doubt drew many inferences from the evidence unfavorable to appellant. The evidence on the subject left no room for doubt that attorney Wasson conceived the idea of inserting in the contract the "covenant of nonsuit," knowing at the time, from the memorandum which he had received from Schreiber, "we have purchased all the rights to the title of the book QUEEN OF THE FLAT TOPS, for the price of $20,000," that the purchase had been definitely agreed upon. It would appear clear, also, that it was the insistence of Wasson in this connection which caused the officers of appellant to breach the agreement. Wasson's testimony that Schreiber told him "that we were interested in purchasing the right to use the title Queen of the Flat Tops, and I believe he told me for $20,000," was so directly contradicted by the written memorandum as to justify the court in rejecting it. The finding that respondents were ready, willing and able to perform the oral agreement but appellant refused to perform unless respondents agreed to the "covenant of nonsuit," that this covenant was contrary to the oral agreement, and that appellant repudiated and refused to perform the oral agreement, is amply supported by the evidence.

No other point is presented for our consideration.

Judgment affirmed.

Shinn, Acting P. J., and Wood, J., concurred.