[Civ. No. 17467.   Second Dist., Div. Three.   Nov. 29, 1950.]

GREGORY LA CAVA, Appellant, v. MARY PICKFORD,
Respondent.

Newmark & Hamblin and Thomas D. Mercola for Appellant.

Wright, Wright, Green & Wright, Loyd Wright, Richard M. Goldwater and Charles A. Loring for Respondent.

WOOD (Parker), J.—In this action for damages for breach of an alleged oral contract, and for the reasonable value of services rendered, judgment was for defendant. Plaintiff appeals from the judgment. He asserts that the evidence was insufficient to support certain findings.

It was alleged in the complaint, in substance, that: About March 19, 1945, plaintiff and the defendant Mary Pickford entered into an agreement whereby defendant agreed to employ plaintiff, and plaintiff agreed to work for defendant, as

director, writer and "in charge of" production of a motion picture known as "One Touch of Venus"; defendant agreed to pay plaintiff as consideration for said services a stated sum of money plus a percentage of the profits (specifically set forth in the complaint); prior to March 19, 1945, defendant promised to reduce said agreement to writing, and in reliance upon said promise and agreement plaintiff entered into the performance of said agreement; about March 19, 1945, said agreement was reduced to final form in writing, and about March 29, 1945, defendant refused to execute said agreement; about April 4, 1945, while plaintiff was performing the agreement, defendant wrongfully terminated and repudiated the agreement, and has prevented plaintiff from performing the conditions of said agreement. The complaint also included a cause of action for the reasonable value of services rendered.

Defendant, in her answer, denied generally and specifically the allegations of the complaint to the effect that the parties had entered into an agreement, and she denied that she was indebted to plaintiff. It was alleged, as an affirmative defense, that: Defendant, acting on behalf of The Venus Company, a corporation, and not for herself, had certain negotiations with plaintiff with respect to a contract under which plaintiff would direct a photoplay to be produced by The Venus Company; it was agreed that a contract was to be prepared setting forth the terms and conditions of the employment, and that neither party was to be bound by the terms of any agreement until said terms had been reduced to writing and signed by the parties; during the process of negotiating the terms and conditions of said employment, plaintiff at his own request voluntarily appeared to render services subject to the terms and conditions of an agreement to be entered into, but with the understanding that The Venus Company was not to be obligated to plaintiff or plaintiff to The Venus Company until said contract had been agreed to and signed; during the pendency of the negotiations said negotiations were terminated and no agreement was entered into. It was also alleged, as an affirmative defense, that about March 29, 1945, plaintiff orally released defendant from all claims and obligations of any kind.

The court found among other things, that: Defendant did not enter into an agreement with plaintiff; prior to March 19, 1945, defendant had certain negotiations with plaintiff with respect to a proposed contract under which plaintiff would render personal services as writer and director of a photoplay entitled "One Touch of Venus"; at the beginning

of said negotiations plaintiff's agents were informed that said photoplay would be produced by The Venus Company, a corporation which had been formed for that purpose, and that "if a contract was entered into with plaintiff" the contract would be with said corporation; it was the intention of the parties that after all of the terms of said proposed contract had been agreed upon, the contract would be reduced to writing and signed by the contracting parties; there would be no binding or enforceable contract until final terms of the contract had been agreed upon in writing and signed by the parties; before all of the terms of the contract had been agreed upon, plaintiff, pursuant to arrangement with defendant, commenced preliminary work in connection with the proposed production of the photoplay; about March 30, 1945, while negotiations were still in progress, a conference was held between plaintiff and representatives of defendant, acting on behalf of The Venus Company, with reference to the proposed production and certain provisions of the proposed contract; during said conference the plaintiff left the conference and did not thereafter appear at the offices of defendant; about April 4, 1945, all negotiations with reference to the proposed contract were terminated. The court also found that plaintiff did not perform services for defendant at her request as a writer, director or producer; that defendant did not promise to pay plaintiff a reasonable sum therefor; and that any work done by defendant in connection with the proposed production was not worth any sum.

Appellant contends that the evidence conclusively established that the parties entered into a binding oral agreement on Sunday, March 18, 1945; and that the findings that the parties did not intend to be bound until a written contract was signed are not supported by any substantial evidence.

The persons who participated in the negotiations hereinafter referred to were the plaintiff La Cava, his agents Everett N. Crosby and Jack Maurice, the defendant Mary Pickford, her agent Sam Coslow, her attorney I. H. Prinzmetal, and the business manager of The Venus Company, C. J. Tevlin.

During October, 1944, the Pickford Corporation purchased "the rights" to a stage play entitled "One Touch of Venus." About October, 1944, Miss Pickford and Coslow entered into a written agreement which provided that Coslow would render his "exclusive services" in connection with the production of said photoplay, including the "handling of any production matters that she might designate." In January, 1945, a corporation, known as The Venus Company, was organized.

About March 1, 1945, Maurice (plaintiff's agent) had a conversation with Coslow (defendant's agent) relative to the employment of La Cava as director of the motion picture "One Touch of Venus." Maurice testified that he understood that Coslow was representing Miss Pickford, and he asked Coslow whether he would be interested in La Cava, and that Coslow said, "Yes."

About March 6, 1945, at a meeting arranged by Maurice and attended by La Cava, Coslow and Maurice, there was a further discussion relative to employing La Cava, and Coslow left a copy of a writer's incomplete "treatment" of the script of the proposed photoplay, "One Touch of Venus," with La Cava.

About March 10, 1945, at a second meeting which was attended by the same three persons, La Cava stated that he had read the "treatment," he thought it was "exciting," and that something could be made of it.

On March 15, 1945, there was a meeting in Miss Pickford's office which was attended by Miss Pickford, Coslow, Prinzmetal, La Cava, Crosby and Maurice. At this meeting, referred to as the "friendly meeting," it appears that everyone was happy over the prospect of La Cava directing the play, and there was a general discussion about the play and about producing it in technicolor. Miss Pickford testified that she stated at the meeting that it was important that the picture be done in technicolor, and she hoped they could get it; that she told La Cava she had been promised technicolor and she hoped they could get started by July 15th; that she told Prinzmetal (her attorney) to "get together with Mr. Crosby and see about working out a contract." At said meeting, La Cava consented "to work on the picture."

On March 16, 1945, Crosby and Maurice went to Prinzmetal's office and had a discussion with him regarding the amount of compensation to be paid for La Cava's services. They told him the amount of compensation La Cava "would want," and Prinzmetal stated that he felt the demand was high and he would have to talk with Miss Pickford and Coslow to see whether it would be "possible to get together on the financial end of the deal."

On Sunday, March 18, 1945, there was a meeting at the home of La Cava which was attended by Coslow, La Cava, Crosby and Maurice. (This is the meeting at which, according to appellant, the oral agreement was made.) There was a further discussion at that meeting pertaining to the amount of

compensation which La Cava should receive. Coslow presented a written schedule which purported to show that La Cava's income, under the proposed "Pickford" deal, would be greater than his income would be under a proposed deal with Paramount Studio. The proposed "Pickford" deal, as set forth in the schedule, provided that La Cava should receive $100,000 plus 10 per cent of the profits. Coslow and Crosby then left the meeting and went to Crosby's automobile, which was in front of La Cava's house, and had a conversation in the automobile. La Cava testified that after Coslow and Crosby returned from the automobile (to the meeting) Crosby said, "Coslow had agreed to 12½ per cent instead of 10, and I [Crosby] think it is a good deal," and that Coslow also had agreed that "we should have" 20 per cent "after they had recouped their costs and whatever other physical charges were indicated on this piece of paper [the schedule]." La Cava also testified that the arrangement provided further that La Cava should receive "20 per cent after a certain amount of money"—$3,000,000 gross had been received; that he (La Cava) said to Crosby, "Well, then, you recommend that this is a good deal," and Crosby said, "Yes, I do"; then La Cava said, "Well, all right. When do we go to work?"; and Coslow said, "Tomorrow morning"; then Coslow shook hands with him and said, "That is a deal; I am tickled to death." La Cava also testified that Coslow shook hands with him and said, "It is a deal and I will now go and call Mary"; that Coslow went to the telephone and had quite a long conversation, then he came back and said, "We are all set to go, you [La Cava] appear at United Artists tomorrow morning." La Cava also testified that during the meeting they talked about the time when the picture would start, and that it was to start "not later" than June 30th; that they discussed screen credits, and that La Cava was to be the producer; that La Cava told Coslow that a Miss Kay had worked with La Cava over a period of fifteen years and she would be very valuable "if she were put on the payroll"; that Coslow "consented to it."

Crosby testified that, at said meeting on March 18th, they went over the whole deal "until we finally arrived at a point where Mr. Coslow said he thought he could get that deal through"; that Coslow shook hands with all of them, and said he was going to see Miss Pickford immediately, he was sure he would have her O. K. and, if so, he wanted La Cava to start work the next morning; that the deal which Coslow was going to submit to Miss Pickford was that La Cava should

receive $100,000 plus 12½ per cent "of the gross" up to $3,000,000 and "after that, 20 per cent of the gross"; that he (Crosby) "was to go to Prinzmetal's office the next morning and start contracting process to be written." Crosby also testified that La Cava wanted the billing to read that the picture would be produced and directed by La Cava; Coslow said he was pretty sure he could get Miss Pickford to agree to that; they also "arrived" at the distribution arrangement, and "the starting date of June 30th"; there was also some talk about hiring Miss Kay as La Cava's secretary, and that Coslow said she would be hired.

Coslow testified that, at said meeting on March 18th, they discussed the script, the way La Cava wanted to treat the picture and the "terms"; that La Cava was to get a salary and a percentage; he was to get part of his salary in cash, part of it was to be deferred, and they finally "boiled it down to something which Mr. Crosby wrote on a piece of paper" which Coslow was "to take back to Miss Pickford." He also testified that Crosby wrote the "final terms" on a piece of paper, and he (Coslow) stated they had a "deal" if Miss Pickford would approve it—that he would discuss the matter with her and then report to La Cava's agents later that day. He also testified that Maurice said it looked like they had "a deal," and he (Coslow) then said, "Pending the drawing up of a contract and agreeing to certain very salient terms"; that he (Coslow) told them there were several things they should talk to Prinzmetal about.

On said March 18th after said meeting, Coslow had a telephone conversation with Miss Pickford, and then he had a telephone conversation with Maurice relative to his conversation with Miss Pickford. Coslow testified that he told Maurice that "Miss Pickford felt that at this point the wisest course would be to turn the matter over to her attorney and Mr. La Cava's agent and let them see what they could do about drafting a written contract"; that Maurice replied something to the effect that he thought it was the wisest move at that time, and "they" would see her attorney the following morning. Maurice testified that Coslow told him to "have Mr. La Cava at the studio tomorrow morning ready to go to work"; that Maurice then called La Cava and Crosby and notified them regarding his conversation with Coslow—and he told La Cava that Coslow had said, "We have a deal" and have "La Cava go to work in the morning." Miss Pickford testified that she told Coslow in a telephone conversation on March 18th to

tell La Cava and his representatives that she "agreed that the contract should be drawn up," and to tell them that she "wished them to get in touch with Mr. Prinzmetal about a contract"; that she also told him that the deal was subject to the contract and Prinzmetal's approval and to the approval of La Cava's attorney; that she also told him that the deal was to be satisfactory to Prinzmetal, her representatives, and La Cava's representatives, "to be reduced in writing and produced in a contract." She testified further that it was very definitely her understanding that a written contract would be prepared and signed. Coslow testified that she told him (in that conversation) that she did not want to enter into any deal with anyone without a contract in writing.

After the meeting on March 18th La Cava, according to his testimony, "abandoned" all negotiations regarding other pictures. On March 19th he went to the studio (United Artists) where, with the consent of Miss Pickford, an office was assigned to him. He began some work in connection with the production of the photoplay. A few days later Miss Kay, who had been employed with the consent of Miss Pickford, began research work in connection with the play. With reference to an office being assigned to La Cava, and with reference to employing Miss Kay, Coslow testified that Maurice had told him, prior to the time he talked to Miss Pickford by telephone, that La Cava had "no place to park," and asked him if La Cava might sit in one of their offices while the contract was being drafted; that in his (Coslow's) conversation with Miss Pickford he told her about that request and she said she had no objection to La Cava occupying an office while they were "dickering on the contract"; he also told her about the proposal to employ Miss Kay and, "after a great protest," she said it was all right. Miss Pickford testified that La Cava said he would like to sit in from the beginning; that the office was not offered by her or Coslow; that it was made available at La Cava's request pending the drawing of the contract. La Cava testified that he did not request the use of an office.

On March 19th, Crosby went to the office of Printzmetal and told him about the meeting at La Cava's home. Prinzmetal testified that Maurice was with Crosby, and that they told him "they had finally gotten together on the amount of money that La Cava was to get" for the picture; they said La Cava was to get $50,000 in cash, $50,000 "deferred," 12½ per cent of the profits until the gross was $3,000,000, and 20 per cent

of the profits when the gross exceeded $3,000,000; they said Coslow wanted them to see Prinzmetal for the purpose of "drawing a contract which would incorporate those provisions." He (Prinzmetal) also testified that he told them it was a very "vague type of deal"; he asked them what they meant by "gross," and told them there is a question as to what "net profits" are; he asked them "what happens if the picture costs so much that at the so-called $3,000,000 point" there are no profits? and they said they didn't discuss that (with Coslow); he (Prinzmetal) told them it was a difficult kind of contract to work out, and said he would try to work it out "as he saw it," would talk it over with Miss Pickford to see if she understood it the way they (Crosby and Maurice) understood it, and then he would submit it to them. He testified further that one of them handed a document to him and said it was a copy of excerpts from a contract which La Cava had "with Universal" (in 1941), and stated "this is to be the contract here, all of these provisions are to be incorporated in the contract which you are to draw"; he looked the contract "over" and told them that certain provisions surprised him; he read a provision to them which gave La Cava sole charge of production of the photoplay and another which gave him the right to designate the cameraman, art director, musical director and other members of the staff; he told them he did not see how Miss Pickford could "agree to that," and that he thought such provisions would be in contravention of her obligations under a contract with United Artists Corporation; he said he would have to take it up with Miss Pickford and "other people concerned," and they replied "go ahead and do that," but get the contract "out in a hurry, because everyone concerned is very anxious to get the thing started right away." (Maurice testified that Prinzmetal had requested excerpts from the Universal contract to use "as a form" in drawing their contract.)

Crosby testified that he went to Prinzmetal's office on said occasion alone; he told Prinzmetal they had "completed a deal" at La Cava's home, and he gave him all the "details of the deal"; Prinzmetal "then telephoned Mr. Coslow to get his approval which he got," and Prinzmetal said he would start writing the contract; they talked about the "billing," and Prinzmetal said he did not know whether Miss Pickford would give La Cava "that kind of billing," and he (Crosby) stated "They approved it"; they talked about the payment of the $100,000, and whether La Cava would be willing to take half

of it this year and half of it next year, and Crosby said he would have to find out. He also testified that he took the matter up later with La Cava, and La Cava said that would be all right, and then Crosby communicated this fact to Prinzmetal. He testified further that the first $50,000 was to be paid in 20 payments of $2,500 each payable weekly, and the first payment was to be made on Monday (March 19th), the day La Cava "went to work."

Thereafter, Prinzmetal procured a copy of the Universal contract, from which the excerpts purportedly were taken, and found there were provisions in it which qualified or limited La Cava's authority; he had a conversation with Miss Pickford and Mr. Tevlin, who had been employed by The Venus Company in the early part of March, 1945, as business and financial manager for the production of "One Touch of Venus"; he then prepared a draft of a contract between The Venus Company and La Cava which was delivered to Tevlin about March 22, 1945. Tevlin testified that he delivered a copy of said contract to Maurice about March 24, 1945; that he had no conversation with Maurice or Crosby at that time— he merely handed a copy of the contract to Maurice and said to him, "Here is a copy of the agreement you have been asking for." Crosby testified that he and Maurice went to the studio where they had a meeting with Tevlin and Coslow; Tevlin informed them that the contract would have to be changed and that he had changed it; he told them what the changes were; he (Crosby) refused to accept the changes, and Tevlin said, "That was it," and he gave Crosby the contract.

About March 26, 1945, Crosby and Maurice took the contract to Prinzmetal's office and told Prinzmetal that they objected to certain provisions in it. Prinzmetal testified that they suggested changes in the contract; that Crosby wanted the contract to state, in addition to the provision that the production was "Directed by Gregory La Cava," that it was "A Gregory La Cava Production"; Crosby also objected to a provision that the first weekly payment of compensation would be on the first day of "shooting of the picture," and he said the compensation should start immediately; he also objected to the sum of money set forth as the anticipated cost of production, and he objected to the distribution charge; he requested a provision limiting the charge for printing and advertising; he (Prinzmetal) told them he would discuss the matter with Miss Pickford. Crosby testified that he told Prinzmetal that was not the agreement he had made with

Coslow; Prinzmetal replied that it was not his fault it was changed—it was "the new deal they had decided upon and that was what La Cava would have to take"; and Crosby replied that he did not think La Cava would agree to it.

On March 28, 1945, La Cava told Tevlin that if he (La Cava) "was going" to start the picture in June, he felt that the "key people" (cameraman, art director, etc.) should be "brought in immediately," and Tevlin told him he would go into the matter with him in a few days.

On March 30, 1945, a meeting was held in La Cava's office at the studio which was attended by La Cava, Miss Kay, Maurice, Coslow and Tevlin. Also present were Mr. Siegel, a writer, and Mr. Nadel, a production manager, who apparently had been employed by Coslow in connection with the production of "One Touch of Venus." There was testimony that Tevlin asked La Cava, at that meeting, when he was going to have something "on paper" about the story, and La Cava replied that they were not ready to put anything on paper—that was not the way he worked—and he had never made an agreement to do so; he (La Cava) told them the story as far as he "had gone"; Tevlin asked what progress he was making otherwise, and La Cava replied that it was impossible to make progress with no one through whom he could function; Tevlin stated that he didn't want La Cava to call the "key people in,"—that there was no technicolor "commitment," they might not get such a commitment until August or September, and they could not guarantee it would be available then; La Cava arose from his chair and said the proposition had "lost its integrity," and then he left the room.

Tevlin testified that, at said meeting last mentioned, La Cava also stated as follows: he was surprised; he had not contemplated that the picture might be made in black and white; it was entirely immaterial to him whether he made the picture; and "we owed him nothing provided we used none of the material" he had created.

La Cava testified that, at said last-mentioned meeting, when Tevlin said they were unable to get technicolor and would have to postpone the picture, he (La Cava) stated, "That is not in line with my agreement" to start not later than June 30th; he also said that if Tevlin would sit right down and write a note stating they would not use any of the material La Cava had devised and about which he had just told Tevlin and Coslow, he would take his hat "and go home and it won't cost you a cent"; and he (La Cava) then told them that if they

proposed to revise his original agreement with Miss Pickford and Coslow, Tevlin would have to discuss it with his agents.

After La Cava left that meeting, Maurice and Tevlin engaged in a discussion. Tevlin testified that Maurice said "this makes it a completely different proposition and you couldn't expect Greg [La Cava] to wait until September to start this picture; it is a completely different deal and I will have to take it up with Crosby."

The next morning, March 31st, Maurice and Crosby went to Tevlin's office and told him that the deal had been entirely changed. Tevlin testified that he told them why "we were dissatified with the other deal," and he "pointed out to them that La Cava's method of proceeding with the picture had put us to a great disadvantage."

The next morning, April 1st, Maurice and Crosby had a meeting with La Cava. On April 2d, Maurice and Crosby went to Prinzmetal's office. Crosby testified that he asked Prinzmetal why the contract had been changed, and that Prinzmetal said he did not know, that it had been taken out of his hands and was being handled by Tevlin. Prinzmetal told them that he would have a discussion with Miss Pickford. Apparently after having talked with Miss Pickford, Prinzmetal had a telephone conversation with Maurice. Prinzmetal testified that he told Maurice that "negotiations for the contract were terminated." Maurice testified that Prinzmetal told him that "the deal is cold." On April 3d Tevlin wrote a letter to Miss Kay notifying her that her employment was terminated as of that date.

On April 4th a meeting was held in Miss Pickford's office which was attended by Miss Pickford, Coslow, Tevlin, Crosby and Maurice. Crosby asked Miss Pickford what the trouble was with respect to La Cava. She said that she was dissatisfied with him, and she stated some of her reasons for being dissatisfied. Crosby testified that she stated they "were absolutely cold on Mr. La Cava and didn't want him at all, any kind of terms." This was the last meeting held, and it appears that there were no further negotiations or communications relative to executing a contract.

With reference to the purpose of the meeting on March 18th, Coslow testified that it was to get an "asking price on Mr. La Cava's services"—that Miss Pickford told him to "Go out and see what they want and let me know." Maurice testified, with reference to the purpose of said meeting, that Coslow called him and asked him if "we couldn't bring this

thing to a head, that he wanted to get going,'' and he (Maurice) then arranged for the meeting. Crosby testified, with reference thereto, that Coslow suggested the meeting to see if he couldn't get the deal worked out a little faster.

La Cava testified that he understood that a written contract would be prepared—that it ''was to be reduced to legal terminology, the usual custom,'' and that it was his understanding that Crosby and Maurice would meet with Prinzmetal and work out the written contract but from the ''conclusion of the meeting'' on the 18th he was leaving it to Crosby and Maurice to get the contract into satisfactory form for signature. He also testified that he did not remember ''one instance'' when he did not start to work before he signed a written contract.

On March 22, 1945, a writer for the Los Angeles Examiner (L. Parsons) stated in that newspaper that La Cava had ''signed with Mary Pickford to do 'One Touch of Venus,' '' and ''Mary couldn't be happier that she has him under contract.'' While Miss Pickford was a witness she was asked if she had any talk or communication with that writer with respect to La Cava's connection with the picture. She replied, ''I might have. I don't recall having spoken to Miss Parsons myself.'' She was also asked whether she or someone under her direction gave that writer the substance of said statement. She replied, ''It is possible, yes.'' On March 23, 1945, an article appeared in a trade paper (''Variety'') which stated in part: ''Gregory La Cava was signed yesterday to direct 'One Touch of Venus' for Mary Pickford.'' The publicity director for the photoplay testified that said article was the essence of a press release which he sent out; that he had issued press releases regarding La Cava's connection with the photoplay, and that before he issued them he cleared them with Miss Pickford; that on La Cava's first day at the studio, Miss Pickford told him (publicity director) that ''La Cava was going to come on the picture to direct it.'' On March 21, 1945, Coslow sent a telegram to Mary Martin (an actress) which stated in part, ''Thought you would be happy to know we have just signed Greg La Cava to direct 'One Touch of Venus.' ''

Appellant contends, as above stated, that the finding that the parties did not enter into an agreement, and the finding that they did not intend to be bound until a written contract was signed, are not supported by the evidence. He argues that, ''The question of 'intention' with which we are here concerned is that intention which was manifested to the

other party, and not by what Miss Pickford or Coslow may have had concealed in the secret recesses of their minds.'' He argues further to the effect that even though the parties contemplated entering into a written contract, and even though Miss Pickford did not intend to be bound by anything until a written contract was signed, the evidence shows there was an objective manifestation by the parties of mutual assent to the oral ''deal,'' and that since the manifestation of assent by Miss Pickford was not made conditional upon the execution of a written contract, a binding oral contract was created. He also asserts that, under the evidence here, the finding in question (that the parties did not intend to be bound until a written contract was signed) represents an erroneous conclusion of law. He states that the evidence shows: that the purpose of the meeting on March 18th was to interrupt the negotiations between Crosby and Prinzmetal, and bring the proposed deal to a head one way or the other; that a complete oral deal was made on March 18th—including the financial terms—and that nothing was left unsettled for future negotiations; that he was not told or given to understand that the oral deal had any ''strings'' to it; that he was not told that the execution of the oral contract was to be a condition precedent to the existence of any contract; that on the following day (March 19th) an office was assigned to La Cava, and he commenced work on the contemplated production; and that a few days after March 18th Miss Pickford authorized the publishing of statements to the effect that La Cava was under contract to direct the picture. The question as to whether the parties herein entered into an oral agreement, and whether it was the intention of the parties to enter into an oral agreement that would be binding before the contemplated written contract was executed, were questions of fact for the trial court to be determined from all the surrounding facts and circumstances. The evidence regarding the statements which were made by the various persons at the meeting on March 18th, regarding the statements made by Miss Pickford by telephone on that day, regarding the telephone conversation between Coslow and Maurice on that day, and regarding the statements and conduct of the various persons prior and subsequent to that meeting, has been stated in substance hereinabove. It would not serve a useful purpose to restate the evidence here. There was a substantial conflict in the evidence as to what was said at that meeting, and particularly there was such a conflict as to what was said by Coslow in the telephone con-

versation with Maurice on March 18th after he (Coslow) had talked with Miss Pickford. Apparently the trial court accepted the testimony of Coslow concerning that conversation. There was ample evidence that respondent (defendant) did not intend to enter into an oral agreement with appellant regarding the production of the picture, and the evidence was ample to support a finding that she did not enter into an oral agreement with him. In view of the many important legal problems that would be involved in a production requiring such a large expenditure of money, it is of course reasonable to believe that those who were responsible for financing the production would require that the agreement be in writing. With reference to the statements which appeared in publications, to the effect that a contract had been "signed," and which statements purported to be statements of defendant or to be the "essence" of press releases that had been "cleared" through defendant, it appears that it was not true (as published) that a contract had been signed, and it appears that the full texts of the releases were not in evidence, and the evidence as to what statements she approved for publication was indefinite and uncertain. Under the evidence here the court could have concluded that defendant did not approve the published statements. The findings, referred to in this contention of appellant, that the parties did not enter into an agreement, and that it was the intention of the parties that there would be no binding contract until a written contract was signed by the parties, are supported by the evidence. The case of *Johnston* v. *20th Century-Fox Film Corp.*, 82 Cal.App.2d 796 [187 P.2d 474], upon which appellant relies, is distinguishable from the present case in the respect, among others, that the trial court therein found the fact to be that the parties therein intended that the oral agreement should be effective immediately and prior to the execution of a written contract. It was stated in that case at page 821: "Whether it was the mutual intention of the parties that the oral agreement should become binding *eo instanti* is to be determined by the surrounding facts and circumstances of a particular case and is a question for the trial court."

Appellant also contends that, in any event, the trial court erred in failing to allow the reasonable value of services rendered by appellant. It appears that while appellant was occupying the office referred to herein for a period of 11 days he discussed with Coslow and others questions regarding cast, costumes, settings, and whether La Cava should go to Chicago

to talk with the "key people"; and that he developed several different ideas regarding the problem involved in producing the picture, but those ideas were not reduced to writing. It does not appear that those ideas were presented to defendant or anyone in such a form that any use could be made thereof. It was a question of fact for the trial court as to whether the alleged services were of any value. There was a conflict in the evidence as to whether appellant occupied the office for his own convenience so that he might "sit in from the beginning" on the discussions regarding the production—while a contract was being prepared, or whether he occupied the office and performed services at the request of respondent. The evidence was sufficient to support the findings that appellant did not perform services for respondent at her request, that respondent did not promise to pay him therefor, and that the alleged services were of no value.

The judgment is affirmed.

Shinn, P. J., concurred.

Vallée, J., deeming himself disqualified, did not participate.

A petition for a rehearing was denied December 22, 1950. Vallée, J., did not participate therein. Appellant's petition for a hearing by the Supreme Court was denied January 25, 1951.