[Civ. No. 19495. Second Dist., Div. Three. Aug. 5, 1953.]

DOMINGUEZ ESTATE COMPANY (a Corporation), Respondent, v. LOS ANGELES TURF CLUB, INC. (a Corporation), Appellant.

Victor Ford Collins and Arnold M. Cannan for Appellant.

Frank P. Doherty and James L. Patten for Respondent.

WOOD (Parker), J.—Action to recover $5,000 allegedly agreed to be paid to plaintiff in compromise of a claim made by plaintiff that defendant unlawfully induced a lessee of plaintiff to breach a lease. Defendant appeals from judgment in favor of plaintiff.

Plaintiff is the owner of 236 acres of land located at 190th Street and Western Avenue in Los Angeles County. On January 3, 1950, the plaintiff and one Curry, a promoter of industrial fairs, entered into a written lease which provided as follows: Curry leased said land for one year, commencing October 1, 1950, and ending September 30, 1951, for the purpose of conducting thereon a "World Transportation Fair." He agreed to pay a minimum cash rental of $25,000, payable in certain installments, including a payment of $2,000 when the lease was made and $5,000 on or before October 1, 1950. He also agreed to pay as additional rental 5 cents for each adult and 2½ cents for each juvenile entering the fair as a spectator. Possession of the land should be delivered to Curry on October 1, 1950, provided he had paid the $5,000 installment due on that date. Curry agreed that he would commence to construct said fair promptly after October 1, 1950, and he would operate the fair from June 3, 1951, to September 30, 1951.

At the time the lease was made Curry paid the first installment of $2,000, and he represented to plaintiff that the total rental payable would exceed $50,000.

Defendant is the owner of 400 acres of land at Santa Anita Park in Arcadia, California, which is used principally for horse races. About March 31, 1950 (approximately three months after plaintiff and Curry made said lease), the defendant and Curry entered into a written lease which provided as follows: Curry leased approximately 200 acres of said land for the purpose of conducting thereon a World Transportation Fair. He agreed that he would commence to construct said fair promptly after the close of defendant's racing season in March, 1951, and he would operate the fair from May 30, 1951, to September 9, 1951. He agreed to pay a minimum cash rental of $35,000.

Curry did not commence the construction of the fair on plaintiff's land, did not operate the fair thereon, and did not pay any money to plaintiff except the first rental installment of $2,000.

Mr. Crawford, the general manager of plaintiff, testified that about April 3, 1950, he read in a newspaper of that date an article indicating that Curry had decided not to go ahead with the fair on plaintiff's land. That article, which was received in evidence, stated in substance that Santa Anita Park would be the site of the World Transportation Fair from May 30 to September 9, 1951, following the leasing of

that property, during the off-racing season, to said Curry; after he had read that article, he received a letter from Curry, dated March 31, 1950, addressed to him as manager of plaintiff, which letter stated, in part:

"This is to let you know, in advance of newspaper release, that I have today completed an agreement with the Los Angeles Turf Club, Inc. under terms of which they are extending to me use of the fifteen million Santa Anita Park as the new site of the World Transportation Fair.

"While it is a matter of personal regret to me that the Torrance site [plaintiff's land] will, therefore, not be utilized as previously planned, the existing facilities at Santa Anita will reduce the cost of staging the fair by at least $509,000. I, therefore, had no alternative but to accept the offer."

Mr. Crawford testified further that on April 4, 1950, the day after he received said letter, he called Curry by telephone (at Dallas) and told him that the letter had been received and he had read the newspaper article; he asked Curry what the reason was—he was under contract with plaintiff to produce the fair on plaintiff's property; Curry replied that he had been approached by representatives of defendant with an offer to conduct the fair on its grounds, which were already prepared, and the fair there would save him a great amount of money; about May 15, 1950, a real estate agent who negotiated the lease with plaintiff on behalf of Curry, told the witness that representatives of defendant had gone to Dallas to offer Curry the facilities of defendant for a fair similar to the one Curry agreed to conduct on plaintiff's property; at a meeting in June, 1950, when the real estate agent, his associate, Curry and the witness were present, Curry said that Jaynes and O'Dorisseo, representatives of defendant, had gone to Dallas and discussed the matter with Curry, and that a principal reason Curry had made the lease with defendant was that defendant had offered its facilities and offered to produce more publicity than he could hope to obtain by having the fair on plaintiff's property; Curry also said at that meeting that in any event defendant was going to conduct a fair of that character and it was offering Curry the first refusal; on June 23, 1950, he (witness) as manager of plaintiff, sent a letter to Curry, the turf club, and Jaynes, who was the manager of leasing operations of the turf club. That letter was to the effect that plaintiff and Curry had entered into the lease herein described, and that plaintiff would seek such redress as may be available against all persons who are parties

to any unlawful arrangement which contributes to any breach of Curry's obligations to plaintiff under said lease. Mr. Crawford testified further that about July 1st, after that letter was sent, Mr. Collins (general counsel and assistant secretary of defendant) called the witness by telephone and asked on what theory plaintiff could show any liability of defendant; he (witness) replied that plaintiff had information that defendant's representatives had approached Curry, and that plaintiff's representatives had an idea that the breach of plaintiff's lease had been encouraged or was the result of an offer of defendant; about June 30, 1950, he (witness) received a letter from Mr. Collins. That letter was to the effect that when the defendant made the lease with Curry it had no information that plaintiff had a lease with Curry, that the lease between defendant and Curry was entered into in good faith, and defendant was proceeding in good faith in connection with the lease. Mr. Crawford testified further that Curry said he would not conduct the fair on plaintiff's property; that when he (witness) wrote the letter of June 23d, and at all times since then, he believed in good faith that plaintiff had a bona fide claim against defendant for damages by reason of its activities in connection with the lease transaction between plaintiff and Curry; plaintiff never consented to release Curry from his obligation under the lease; in the latter part of 1950 or early part of 1951, after plaintiff had been told by Mr. Doherty, one of the attorneys for plaintiff, that a compromise had been made with defendant, the plaintiff leased its said land to a farmer who has been in possession of it since that time.

On July 7, 1950, Mr. Doherty sent a letter to Mr. Collins wherein he stated the substance of plaintiff's lease, and that his understanding of the conditions under which the arrangement between defendant and Curry was made was at variance with the situation outlined in Mr. Collins' letter of June 30th, and that the theory as to liability on the part of defendant is the principle of unlawful interference with business relations.

After said letter of July 7th had been sent, Mr. Doherty and Mr. Patten, the other attorney for plaintiff, had a conversation with Mr. Collins in Mr. Collins' office.

Mr. Doherty (who did not participate in the trial) testified that said conversation was, in substance, as follows: He told Mr. Collins that after plaintiff had entered into a lease with Curry and that fact was made public by a notice in the press,

two representatives of defendant went to Dallas to interview Curry; that plaintiff had information that Curry told the turf club of the existence of plaintiff's lease, and the turf club knew the lease was in existence and it offered a deal to Curry and induced him to breach the lease with plaintiff, and, on that, plaintiff had a claim against defendant. Mr. Collins said that defendant had no information that there was a lease between plaintiff and Curry, that defendant dealt with Curry at arm's length and without knowledge of plaintiff's lease, that defendant entered into the lease in good faith, and he was not the attorney for Curry. Mr. Doherty said that if Curry proceeded with the fair at the turf club, the plaintiff would file suit against Curry and would attach the gate receipts until plaintiff had been paid what was due it under the lease. Mr. Collins said that defendant was not liable, he would take the matter up with his people and see what could be done. He asked what plaintiff would expect in the way of a settlement. Mr. Doherty replied $25,000. Mr. Collins said they would not pay any such sum.

On October 10, 1950, Mr. Doherty sent a letter to Mr. Collins wherein he stated that the time has come when plaintiff must file a suit unless some satisfactory adjustment is made, and he asked that they (the attorneys) try to meet the following Monday. It appears that thereafter, for two or three weeks, the attorneys had telephone conversations regarding the matter.

Mr. Doherty testified that on November 9, 1950, Mr. Collins called him by telephone and said that the best offer we can make is $2,500 now and $2,500 in 30 days; the turf club to be responsible for the payments; he replied that he would take it up with the Dominguez Estate people (plaintiff) and see what they said in reply to his offer. Mr. Doherty also testified that he was talking to Mr. Collins solely as the representative of the turf club, because Mr. Collins had told him that he was not the attorney for Curry; that the two payments of $2,500 were in full settlement of plaintiff's claim against the turf club,—there was no discussion with Mr. Collins of any claim against Curry.

On November 10, 1950, Mr. Doherty sent a letter to Mr. Collins which stated, in part:

"Yesterday you told me the best offer you were authorized to make is the following: $2500 now and $2500 in thirty days, the Turf Club to be responsible for the payments.

"This morning I am authorized to accept the foregoing offer in full settlement of all claims of our people against the Turf Club and Mr. Curry and a mutual cancellation of the lease between our people and Mr. Curry. Briefly, it is a complete settlement where we acknowledge satisfaction of all claims against your people and you do likewise as against the Dominguez Estate Company, and all contractual relations between them are terminated and ended.

"We will prepare the release unless you would prefer to do so.

"I am sending this to you by messenger, today."

On November 17th (Friday), Mr. Doherty called Mr. Collins by telephone and told him that he had not received a response to the letter of November 10th. Mr. Collins replied that he had not received it, that he was leaving for New York on Sunday, and that in his absence Mr. Doherty should discuss the matter with Mr. Cannan (an attorney associated with Mr. Collins). On November 17th, after that conversation, Mr. Doherty sent a copy of the letter of November 10th to Mr. Collins.

Mr. Doherty told Mr. Cannan, in a telephone conversation on November 21st, that he was preparing a release and would send it to him to be executed by his people—that it was a signed release by the Dominguez people. On that day, he sent a letter to Mr. Cannan which stated as follows:

"Pursuant to our telephone conversation of today, I have prepared and will enclose herewith three signed copies of a mutual release in the above-entitled matter. Will you please have all copies signed by the Turf Club and Mr. Curry and return one executed copy to us, together with check for $5,000.00, as mentioned therein.

"It is understood, of course, that the signed copies which I am enclosing herewith shall be of no effect until they have been signed by the other two parties and until payment of the $5,000.00 mentioned in the agreement is made to Dominguez Estate Company."

A copy of the release, referred to in that letter, is set forth below.[1]

---

[1]"AN AGREEMENT executed November 21, 1950, between DOMINGUEZ ESTATE COMPANY, a California corporation as First Party, and I. W. CURRY, as Second Party, and LOS ANGELES TURF CLUB, INC., a California corporation, as Third Party.

"WITNESSETH:

"In consideration of the payment to the First Party of the sum of Five Thousand Dollars ($5,000.00), receipt of which hereby is acknowl-

On December 20th, Mr. Doherty sent a letter[2] to Mr. Collins stating, in part, that they had agreed upon a settlement almost six weeks ago and acted upon this basis, and had executed releases as requested by Mr. Cannan and they have been in Mr. Collins' office almost a month.

On January 6, 1951, Mr. Doherty sent a letter to Mr. Collins stating, in part, that: "Last November, you and I agreed on a payment of $5,000 in settlement of the whole lease matter and other aspects of the claim. $2,500 was to be paid promptly and $2,500 in thirty days. Your office requested us to prepare the releases. We prepared them, had them executed and forwarded to you. I told our people of the settlement and, as above stated, they confirmed it and executed the releases. Thereafter, they proceeded to handle the property . . . and shortly after our agreement, made a new lease . . .. We have a deal and you folks should not hold up the payment of the money . . .." There was no reply to that letter.

On January 17th, Mr. Doherty sent a letter to Mr. Collins

---

edged by the First Party, and in consideration of the mutual agreements herein made and set forth, the parties agree as follows:

"I

"The lease heretofore executed between the First Party and the Second Party and hereinafter more particularly described, hereby is terminated and cancelled and shall be of no further force or effect, and the Second Party releases and relinquishes and quitclaims to the First Party any and all right, title, interest or demand possessed or claimed by the Second Party in or to the property covered by said lease; and each and all of the parties to this agreement and the agents, employees and representatives of each and all of them are released from any and all liability, past, present or future, of whatsoever kind or character, by reason of or growing out of or arising or existing in connection with the execution of said lease or any of the terms or provisions thereof, or by reason of the breach or alleged breach or conduct or activity resulting in the breach or alleged breach, of any of the terms or provisions of said lease. Provided however, the First Party is and shall be entitled to keep and retain as its own the rental installment of Two Thousand Dollars ($2,000.00) paid by the Second Party to the First Party on the execution of said lease.

"II

"The lease referred to herein is that certain lease dated January 3, 1950, executed by and between the First Party, as Lessor, and the Second Party, as Lessee, covering certain real property in the County of Los Angeles, State of California, identified therein as follows:

"The property generally known as the World Transportation Fair property consisting of approximately 236 acres at the Southwest corner of 190th Street and Western Avenue, Los Angeles, California.

"In witness Whereof, the First Party and the Third Party have caused this agreement to be executed in their respective names by their proper corporate officers thereunto duly authorized, respectively, and

---

[2][See note on page 538.]

stating, in part: "My people are at a loss to know why we cannot conclude and finish the deal we made last November, namely, $2500 at that time and $2500 in thirty days." There was no reply to that letter.

On February 1st, Mr. Doherty asked Mr. Cannan when the $5,000 was going to be paid, and Mr. Cannan replied that Mr. Collins "is doing the best he can," he is trying to get Curry to make a contribution of $2,500—that Curry was able to raise only $2,000. Mr. Doherty said that was a matter between the turf club and Curry and that plaintiff's deal was with the turf club. Mr. Cannan replied that if the turf club paid the $5,000 and Curry knew about it, then Curry would let the turf club hold the bag and would not make a contribution.

On February 17th, Mr. Doherty sent a letter to Mr. Collins stating that he had not received a return telephone call as requested by him, and he asked Mr. Collins if he (Mr. Doherty) should write Mr. Wilson (an officer of defendant) to the effect that unless the matter is settled within a reasonable time, it would be necessary to file suit for the $5,000. There was no reply to that letter.

---

their respective corporate seals hereunto to be affixed, and the Second Party hereunto has subscribed his name on the date first hereinabove written.

"APPROVED

"DOMINGUEZ ESTATE COMPANY   AS TO

"By J. R. Lacayo, M.D.   FORM

"(Corporate Seal)   President   C. M. Crawford

"By H. G. Arnold   Manager

Secretary

"I. W. Curry

"LOS ANGELES TURF CLUB, INC.

"By...........................

(Title)

"(Corporate Seal)"

[2]Letter of December 20, 1950: "While you were in the East Mr. Cannan talked several times about the payment to our people of the $5,000.00 agreed upon. He stated that Mr. Curry only had $2,000.00 and the Turf Club wanted to get $2500.00 from him and it would pay the remaining $2500.00. From what you told me day before yesterday, Mr. Curry is having difficulty in raising $2500.00, or has a hesitancy to make a contribution in the total sum of $2500.00. We agreed on a settlement almost six weeks ago and have prepared and acted on this basis. We have prepared and executed the releases as requested by Mr. Cannan, and they have been in your office for almost a month. Our people inquire frequently why we have not turned the money over to them.

"I know your difficulties in a matter of this sort, and I know you are doing whatever is possible to expedite it. I do feel, however, that whatever differences exist between the Turf Club and Mr. Curry should be a matter to be adjusted between yourselves, and that the payment to us should not be held up."

Mr. Doherty testified that he had a telephone conversation with Mr. Collins on April 10th or 11th; Mr. Collins said that he was writing a letter but was telling the substance of the letter by telephone, in case the letter was not received; he said that the city of Arcadia had denied a permit to Curry to hold the fair, and that Curry and the turf club were not going to pay any money, and he was withdrawing his offer to pay $2,500. On April 11th, Mr. Collins sent a letter stating as follows:

"By the time this letter reaches you I will have undoubtedly talked to you on the telephone but, in case we should miss each other, as we sometimes do, I thought I should write you and tell you that I have just been told that Curry has instructed me to withdraw the $2,500 offer of settlement to Dominguez."

On April 12th, Mr. Doherty sent a letter to Mr. Collins stating, in part: "In our negotiations with you we never at any time entertained any offer of $2500, or any other sum, made by you on behalf of Mr. Curry. When you called me and said that Mr. Curry could borrow $2500 from his mother-in-law, and would offer that in settlement, I told you that we had already reached an agreement with the Turf Club for the payment of $5,000 in the matter, and that we were expecting the Turf Club to live up to its commitment. I still expect the Turf Club to carry out its agreement . . .. While we hope that the Turf Club will make the payment before it becomes necessary for us to file suit . . . it is our purpose to bring an action for collection . . .."

Mr. Doherty testified further that, in a conversation in March, 1951, Mr. Collins stated that Curry was making an application for a permit from the city of Arcadia; and that, in a conversation between him and Mr. Collins concerning the execution of the release, Mr. Collins stated that he wanted the release to include Curry because he did not want the agreement between the plaintiff and Curry to be in effect—it would involve litigation between the Dominguez Estate people and Curry, and in putting on the fair at the turf club such litigation would embarrass Curry.

Curry did not sign the release. It was stipulated that the claim of plaintiff was referred by the defendant to Mr. Collins, who was defendant's assistant secretary and general counsel, with authority to contest or compromise the claim.

Mr. Collins testified that, in the telephone conversation on November 10, 1950, he told Mr. Doherty that he thought that this should be a complete settlement all around, and that it

is going to be necessary to have a termination of the Curry-Dominguez lease and that will have to be signed by the Dominguez Company and Curry; Mr. Doherty asked who would prepare that; Mr. Collins replied that he was going to New York and he would appreciate it if Mr. Doherty would prepare it. Then the following questions were asked by the trial judge, and the following answers were given by Mr. Collins: "Q. This is the conversation in which the amount had previously been agreed on? A. The conversation in which the amount was agreed upon. Q. Yes, I see. A. In which the amount was agreed upon. Q. Then this method of terminating the whole matter was discussed? A. That is correct. It was said at that time, your Honor, that the matter should be reduced to a written agreement." The fair was not conducted on the grounds of the turf club.

The court found that between March 31, 1950, and November 10, 1950, a controversy existed between plaintiff and defendant concerning defendant's liability to plaintiff for the breach of plaintiff's lease by Curry; plaintiff was advised by counsel, and that plaintiff honestly and in good faith claimed and believed that defendant unlawfully had induced Curry to breach the lease with plaintiff and to refuse to comply with its terms, and that defendant was liable for damages suffered by plaintiff as a consequence thereof; plaintiff engaged attorneys to file a suit for damages against defendant for allegedly inducing Curry to breach his lease with plaintiff; defendant denied plaintiff's claims, but was desirous of avoiding litigation in connection therewith; defendant referred the matter of plaintiff's claims to one of its corporate officers and general counsel with authority to contest or compromise the same; negotiations relating to the claims were conducted between defendant's general counsel and plaintiff's attorneys over a period of several months; in such negotiations said counsel was informed by plaintiff's attorney that plaintiff had information on which plaintiff in good faith believed that defendant had induced the breach of plaintiff's lease by Curry, and that defendant was liable to plaintiff on account thereof; in such negotiations plaintiff's attorney informed said counsel that if Curry staged the fair on defendant's land, plaintiff planned to sue Curry for rentals of plaintiff's land and to attach the gate receipts to secure satisfaction of judgment; in order to settle and compromise said controversy, said general counsel, on behalf of defendant, made the oral agreement of compromise referred to in the findings; on or about

November 10, 1950, plaintiff and defendant made an oral agreement to settle said controversy and to compromise plaintiff's claims against defendant, whereby defendant agreed to pay $5,000 in settlement of all said claims of plaintiff against defendant on account of allegedly inducing a breach of the lease by Curry; as a part of said agreement, defendant requested that plaintiff cancel the lease between plaintiff and Curry and not to take any action against Curry on account of the lease, and not to interfere with the production of the fair on defendant's land; plaintiff agreed to, and did, comply with said request; plaintiff, in reliance upon said oral agreement, released Curry from his obligations under the lease and relet said land on a basis less favorable than the terms of the lease with Curry.

Appellant contends that the alleged agreement of settlement is invalid because there was no consideration for it; that there was no consideration, in that, there was no basis for plaintiff's claim. It is argued that there was no evidence showing any basis for a belief that defendant, at the time it made a lease with Curry, had any knowledge or notice of plaintiff's lease with Curry, or that defendant did anything to induce him to break his lease with plaintiff. ■ "[A]n action will lie for unjustifiably inducing a breach of contract." (*Imperial Ice Co.* v. *Rossier*, 18 Cal.2d 33, 39 [112 P.2d 631].) ■ "A promise given in consideration of the settlement or compromise of a dispute or controversy the event of which is uncertain or doubtful, is founded upon a sufficient consideration." (*Baker* v. *Philbin*, 97 Cal.App.2d 393, 397 [218 P.2d 119].) It was also said in the case last cited, at page 397: "The trial court found that the claim was asserted in good faith. This was a finding of good consideration for the compromise, even though the claimant might not have prevailed in a lawsuit based on the contract." In *Kale* v. *Bankamerica Agr. Credit Corp.*, 2 Cal.App.2d 113 [37 P.2d 494], the plaintiff claimed an agistor's lien for hay furnished for sheep which were on land allegedly owned by plaintiff. The defendant therein wanted to move the sheep to other land, but plaintiff refused to allow them to be moved until his bill for hay had been paid; whereupon defendant agreed that if plaintiff would allow the sheep to be moved, defendant would pay the bill. Plaintiff therein, relying upon the promise, consented to the removal. It was said therein, at page 116: "It is established by the findings that the sheep were not pastured upon the lands of plaintiff . . . and therefore plaintiff never acquired an agistor's lien upon the sheep.

It would therefore be true, as appellant alleges, that it would be entitled to judgment thereon, if that were all that was found. But the court went further however and found that '. . . said plaintiff then and there claimed in good faith to be entitled to the possession of said sheep . . .', and that 'In settlement of said conflicting claims' the corporation made the promise upon which the action was brought, which is sufficient to justify the final judgment . . ..'' In *City Street Imp. Co.* v. *Pearson*, 181 Cal. 640 [185 P. 962, 20 A.L.R. 1317], it was said at page 650: ''Where there has been a compromise of doubtful claims, or concessions and benefits given and received in good faith, as consideration for a promise, the actual validity of the claims is immaterial; otherwise, as remarked by Mr. Wharton, 'there could be no compromise of litigation, since there is no litigation in which one or the other party, if the case be pressed to judgment, does not fail to make out his case.' '' ▮ The evidence in the present case with respect to the activities of defendant, as shown by the letter sent by Curry to plaintiff's manager, and as shown by the oral statements of Curry and the real estate agent to said manager, was not admissible to prove that in fact the defendant did the things there recited, but the evidence was admissible to prove that statements that defendant did those things were in fact made to plaintiff. Stated in another way, such evidence was admissible to prove that plaintiff had certain alleged information that defendant did the things recited, but the evidence was not admissible to prove that in fact defendant did those things. That evidence presented a question of fact as to whether there was a basis for a bona fide belief or claim on the part of plaintiff that defendant induced Curry to breach his lease. The findings to the effect that plaintiff believed in good faith that defendant unlawfully induced Curry to breach his lease, and that a bona fide controversy existed as to the liability of defendant for allegedly inducing Curry to breach the lease, are supported by the evidence. The contention that there was no consideration for the alleged agreement is not sustainable.

Appellant also contends that no agreement of settlement was reached. It is argued that since the agreement was to be in writing and since the writing was not signed by Curry, the oral agreement was not valid. The defendant does not assert that the proposed written release signed by plaintiff did not include all that was agreed upon orally. The attorneys for plaintiff, in preparing the proposed written release, included

therein, at the request of defendant, a provision to the effect that Curry released the plaintiff, and that plaintiff released Curry, from all obligations under the lease between Curry and plaintiff; and they included, at the request of defendant, a provision that Curry sign the proposed release. The proposed release, signed by plaintiff's authorized officers, was delivered to defendant's general counsel on November 21, 1950. It has never been signed by defendant or Curry, but it has been retained by defendant since that date. After said date, plaintiff sent various letters to defendant's counsel urging that defendant comply with the agreement to pay the $5,000, but there was no written reply thereto. In conversations after said date, counsel for defendant stated that he was doing the best he could to get Curry to pay half of the agreed amount. Counsel for plaintiff said, in reply thereto, that the settlement was with defendant and not with Curry. It was not said in those conversations that Curry would not sign the release. On April 11th, about five months after the proposed release had been delivered to defendant, the plaintiff was notified by defendant's counsel that the city of Arcadia had denied a permit to operate the fair on defendant's land, and that defendant was withdrawing its offer to pay $2,500, and that Curry had *"instructed"* counsel for defendant to withdraw "the $2,500 offer of settlement." It does not appear that the failure of defendant to sign the release or to obtain the signature of Curry thereto was by reason of any unsatisfactory provision in the release. No objection was made by defendant or Curry to the form or substance of the document. The only reason assigned by defendant for its failure to sign the release or to obtain the signature of Curry was that the city of Arcadia denied Curry's application for a permit. The failure of Curry to sign was not in any manner the fault of plaintiff. No representative of plaintiff had communicated with Curry regarding the settlement of plaintiff's claim against defendant. Mr. Doherty, or his associate counsel, never saw Curry, or talked or communicated with him. It is to be assumed that defendant was in a position to communicate with Curry, and was communicating with him, in regard to the matter of signing the release, since the counsel for defendant said that he was trying to get Curry to pay half of the agreed amount, and since he also said (in his final letter) that Curry had "instructed" him to withdraw the offer of $2,500, and since it was defendant that wanted Curry to sign. Defendant asserts, however, that the duty to have Curry sign was upon

plaintiff. Plaintiff did not need a release from Curry,—when the oral agreement was made on November 10, 1950, Curry had already repudiated the lease with plaintiff eight months previously) as shown by his letter of March 31, 1950, and he had failed to make the payment due on October 1, 1950, and he had not performed in any way any of his obligations under the lease with plaintiff. Insofar as plaintiff was concerned, its lease with Curry had been as effectively terminated by Curry, by his letter and conduct, as if he had signed the proposed release, which was requested by defendant. The only reason assigned by defendant for its request that plaintiff sign a release of Curry (from his obligations under plaintiff's lease) was that if litigation were pending between plaintiff and Curry during the fair on defendant's land it would be embarrassing. Plaintiff did sign the release, and the only thing that remained to be done to avoid such embarrassment was for defendant and Curry to sign the release. As above indicated, it was not within the contemplation of plaintiff or defendant that plaintiff should do anything to obtain Curry's signature. It was defendant that brought Curry into the matter of the settlement of plaintiff's claim against defendant, and it was defendant who was in communication with Curry in regard to the settlement. Furthermore, the suggested matter of embarrassment to defendant, if litigation were pending during the fair, could not arise,—since Curry did not operate the fair. The claim of plaintiff against defendant existed irrespective of whether the fair was produced or whether Curry signed the release. After the oral agreement was made, plaintiff, relying on the agreement, leased its land to a farmer.

The question as to whether there was an oral agreement of settlement between plaintiff and defendant was a question of fact for the trial court, and the court found that there was such an oral agreement. Even though it was contemplated that a written agreement embodying the terms of the oral agreement would be entered into, the oral agreement was not vitiated merely because the defendant and Curry chose not to sign the proposed written agreement, as to which there was admittedly no objection either to form or substance. Especially, the oral agreement was not vitiated, under the circumstances here, where the defendant held the proposed written agreement about five months, without making any objection to any part of it, and finally chose not to sign it for the sole reason that Curry did not get a permit for the fair. In *Johnston* v. *20th Century-Fox Film Corp.,*

82 Cal.App.2d 796 [187 P.2d 474], it was said at pages 820-821: "The trial court found that the oral agreement of April 14, 1944, was binding on that date, although it was subsequently to be reduced to writing. It has been held repeatedly that when the respective parties orally agree upon all the terms and conditions of an agreement with the mutual intention that it shall thereupon become binding, the mere fact that a formal written agreement to the same effect is to be prepared and signed does not alter the binding validity of the original oral agreement." Appellant asserts that the letter of counsel for plaintiff, which accompanied the proposed written release, establishes that an agreement had not been reached. It (appellant) refers to the portion of the letter which states that "the signed copies [of the release] which I am enclosing herewith shall be of no effect until they have been signed by the other two parties and until payment of the $5,000.00 mentioned in the agreement is made." The oral offer of settlement which had been made by defendant had been accepted by plaintiff, and the sending of the proposed written release by plaintiff was an attempt to comply with defendant's request that there be a written release. The recital in the letter that the signed copies shall be of no effect until they have been signed by the other two parties is not to be interpreted, under the evidence here, to mean that the oral agreement theretofore made was ineffectual. The statement in the letter was that the signed copies should be of no effect until they were signed and the money was paid. It is understandable that plaintiff would not want its release of Curry, who did not participate in making the oral agreement, to be outstanding and effective unless Curry joined in the mutual release by affixing his signature thereto. The finding of the trial court that plaintiff and defendant made an oral agreement to settle and compromise plaintiff's claim against defendant, for allegedly inducing a breach of plaintiff's lease by Curry, is supported by the evidence.

Even from defendant's point of view that it was to pay the $5,000 only in case Curry signed the agreement it still would have had no valid defense to the action. Its promise to pay plaintiff was not upon the condition that Curry contribute $2,500 of the amount. It imposed that condition which was no part of its agreement with plaintiff. It appears that Curry was willing to contribute $2,000 but that defendant would not reduce its demand. It therefore appears that the

failure to obtain Curry's signature was due to its demand upon Curry with which plaintiff had nothing to do. Defendant's position seems to be that it does not have to pay plaintiff $5,000 because Curry refused to pay it $2,500. It could not impose a condition upon its promise which was not agreed to by the plaintiff and thus escape its liability.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 1, 1953.