In re INFORMATION CONTROL
CORPORATION, Debtor.
INFORMATION CONTROL CORPORA-
TION, a corporation, Debtor in
Possession, Plaintiff,
v.
Billy D. LEWIS, dba BDL Electronics
Company, Defendant.

Bankruptcy No. LA 81–04325–RO(JA).
Adv. No. LA 82–8710–RO(JA).

United States Bankruptcy Court,
C.D. California.

Sept. 13, 1983.

Louis E. Kempinsky, Gendel, Raskoff, Shapiro & Quittner, Los Angeles, Cal., for defendant.

Joseph E. Stalder, Torrance, Cal., for plaintiff.

James E. Eichstaedt, Los Angeles, Cal., U.S. Trustee.

## MEMORANDUM OF DECISION

JOHN D. AYER, Bankruptcy Judge.

Information Control Corporation ("ICC"), the debtor and plaintiff, was a maker of electronics products. It manufactured a line of electronic modules called "the Abacus line." Billy D. Lewis ("Lewis") was at one time an executive of ICC. Later, Lewis himself produced the Abacus line, under a subcontract with ICC. While performing the subcontract, he acquired some purchase orders. He filled those purchase orders, received payment, and divided the proceeds with ICC, all pursuant to agreement and all, so far as appears, without any quarrel.

But it now appears that the purchase orders themselves—the sheets of paper containing the names and addresses of customers—have value independent of the production cycle. In this action, ICC seeks to force Lewis to turn over the purchase orders.[1] Lewis in defense asserts that he had a right to retain all purchase orders. But Lewis asserts further that, in any event, the matter was disposed of by a compromise settlement between Lewis and ICC, consummated some five months before the court issued summons in this suit.[2]

I find that there was indeed a binding settlement, and I therefore give judgment for Lewis. Having decided in favor of Lewis on the issue of compromise, I do not reach the issue of his underlying rights.

## I

The Abacus line consisted mainly of electronic modular packaging products used primarily in military electronics. Lewis is an entrepreneur experienced in the field of micro-processors. Lewis joined ICC as an executive in August of 1979. Lewis resigned his employment in October of 1980, but continued to assist in the marketing of Abacus as a part-time independent contractor. In March, 1981, he severed all connection with ICC, to go into business for himself. In April, 1981, ICC filed this Chapter 11 case.

ICC saw from the beginning of the Chapter 11 case that it would need help if it were to keep alive the Abacus line. Lewis for his part saw that Abacus offered him an opportunity to develop his entrepreneurial skills. Consequently, just a few days into the case, ICC and Lewis entered their subcontract agreement. Lewis, under the business name of BDL Electronics Company ("BDL"), undertook to manufacture and market Abacus. In exchange for this privilege, he agreed to pay a percentage of the gross to ICC. Lewis and ICC reduced their agreement to writing. The writing contained, among others, the following clause:

"BDL is authorized to solicit ICC customers for new and continuing business in the name of ICC for Abacus products and services, and to accept any orders. These orders and the resulting receivables will be the property of BDL.... These orders are the sole responsibility and property of BDL."

The subcontract was a month-to-month agreement, giving either party the right to terminate on 30 days notice. Operating under the subcontract, Lewis manufactured and distributed the Abacus line until July, 1982, when he exercised his right to terminate. In the course of the subcontract, Lewis obtained a number of purchase orders. On termination of the subcontract, the rights to the Abacus line reverted to ICC. But Lewis retained physical possession of the purchase orders.

Besides Lewis and ICC, there were other participants in the ICC case. The most notable was the Official Creditors' Committee ("Committee"). While Lewis was making and selling Abacus products, the Committee was trying to find a buyer for the entire Abacus line. At last, ICC and the Committee made a deal with a firm named Logic Technology, Inc. ("Logic"). Logic agreed to pay $175,000 for the Abacus line. But as part of its bargain, Logic demanded that ICC deliver certain purchase orders, alleged to be in the hands of Lewis.

On August 24, 1982, ICC, seeking to meet the demands of Logic, filed its "Complaint for Conversion," beginning this lawsuit against Lewis. But here the parties fell upon the kind of mischance which seems to have become a feature of bankruptcy practice. Just two months previously, in June of 1982, the U.S. Supreme Court had handed down its celebrated decision in the *Marathon* case, *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S.

1. The complaint also seeks general and exemplary damages, but the turnover action is central.

2. The litigants characterize the issue as one of "Accord and Satisfaction." But California law defines an accord as "an agreement to accept, in extinction of an obligation, something different from or less than that to which the person agreeing is entitled." Cal.Civ.Code § 1521 (West 1981). Since there never was a showing that ICC was entitled to anything, it seems preferable to treat the matter as the compromise of a disputed claim.

50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), casting doubt on the very existence of the bankruptcy court. Hence the bankruptcy judge, rather than issuing summons and setting trial on ICC's complaint, entered a boilerplate order declaring that "no disposition will be made of (the case) at this time."

ICC, rebuffed by the court but pressing to complete its deal with Logic, promptly launched another sortie. This time ICC filed an "Emergency Application" against Lewis in the bankruptcy court, demanding that he turn over the purchase orders forthwith. This Application was filed jointly by ICC's lawyer, and by Roger A. Ferree ("Ferree"), who was attorney for the Committee. The Application, unlike the Complaint, got a place on this Court's calendar.

After he learned of the Application, Lewis and his attorney talked with Ferree. As a result of their talk, Lewis offered to turn over to ICC a list of customers who had purchased Abacus materials. According to Lewis, Ferree told him that ICC and the Committee "would accept my offer." ICC for its part took the Application off calendar. On September 10, 1982, Lewis, pursuant to his agreement with Ferree, turned over a customer list.

And there, at least as far as Lewis was concerned, the matter rested. But not so for ICC. ICC still had to deal with Logic. And Logic balked. In December, 1982, some three months after the encounter over the Application, Ferree informed Lewis that Logic wanted not just the names, but also copies of the actual purchase orders. This time Lewis balked. At last in February, 1983, ICC's counsel, still hoping to satisfy Logic, prevailed on the Court to issue its summons against Lewis in the original lawsuit. This Motion for Summary Judgment followed in due course.

## II

As suggested above, Lewis' argument in this motion has two major points. First, he argues that he had a contract right to keep the purchase orders. But second, he argues that in any event any claim was disposed of in September of 1982, when the Application was taken off calendar, and when he delivered some papers to ICC.

Regarding the contract itself, both parties direct the Court's attention to the same language in the subcontract agreement—particularly to the phrase that the "orders are the sole responsibility and property of BDL." The dispute seems to come down to a conflict over the word "orders." Lewis says, in effect, that the "orders" are the pieces of paper, and the information on the pieces of paper. ICC says, in effect, that the "orders" are the right to do the work and to reap the profits.

Without presuming to dispose of this issue, it seems that each of these readings is at least conceivable. Recognizing that there may be a conflict, still Lewis argues that the matter is appropriate for summary judgment. He argues that the issue is one of contract interpretation and that contract interpretation is an issue of law.

I am not so sure. Rather, the question whether contract interpretation is a matter of law seems to me to be a question on which there is a great deal of uncertainty. See, e.g., the helpful discussion in 3 A Corbin, CORBIN ON CONTRACTS § 554 (1960), and the interesting gloss on Corbin by Kaufman in 1 C. Kaufman, CORBIN ON CONTRACTS §§ 554A–C (1982 Supp.). Certainly, there is authority for the proposition that interpretation is a matter of law. One instructive instance is the pair of opinions by the California Supreme Court deciding Argonaut Ins. Co. v. Transport Indem. Co., 6 Cal.3d 496, 492 P.2d 673, 99 Cal.Rptr. 617 (1972), where the majority and dissent split 4–3 on the interpretation of an agreement. About the only thing the Court did agree on was that it was in its power as an appellate Court to do the interpretation—i.e., to treat the matter as a question of law. In any event, the court cannot possibly permit the parties to make an issue of every and any word in agreement, without risking a descent into infinite regress. But no word defines itself. Words derive their meanings from the people who use them; and it would be a brave judge who would say always and in every case that he knows

what those meanings might be. Cf., RESTATEMENT (SECOND) OF CONTRACTS § 201 comment a (1981). Certainly, the tendency of California law has been to support this latter view—to broaden, rather than to restrict, the ambit of fact testimony on questions of interpretation. *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 442 P.2d 641, 69 Cal.Rptr. 561 (1968); *Delta Dynamics, Inc. v. Arioto,* 69 Cal.2d 525, 446 P.2d 785, 72 Cal.Rptr. 785 (1968). Insofar as meaning is thus a question of fact, it is not the sort of issue that should be disposed of on a motion for summary judgment. *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944).

### III

Be that as it may, in this case I do not think I am forced to this choice, for it seems to me that there is another issue on which there is less doubt. And that is the matter of compromise. I find that the parties settled the matter in September when ICC took its motion off calendar, and when Lewis turned the list over to ICC. The compromise of a disputed claim is sufficient consideration to form a binding contract. *Schumm v. Berg,* 37 Cal.2d 174, 231 P.2d 39 (1951); *Dominguez Estate Co. v. L.A. Turf Club,* 119 Cal.App.2d 530, 259 P.2d 962 (1953).

Against the notion of compromise, ICC makes its most vigorous attack on the role of Ferree in the September settlement. ICC argues that there could not have been a compromise, because Ferree had no power to bind the parties. ICC tries to characterize the dispute as one between Lewis and Logic. ICC further emphasizes that Ferree represented only the Committee. In this context, ICC argues that Ferree was a "mediator" who "attempted to use his good offices to settle that matter...." ICC says that no "right thinking attorney" could have expected that Ferree was an agent with authority to bind any of the principals.

I think this misses the mark. Specifically, I think ICC misconceives the relationship between the debtor and the credi-

tors in a Chapter 11 case. The debtor and creditors are sometimes adverse, as the creditors try to collect their claims. But sometimes they are allies, as they join to try to maximize the estate. So here: in this case, taking the record as a whole, it is clear that the Committee and ICC shared an ambivalent relationship, operating sometimes in conflict, and sometimes in concert, with one another. The Committee and ICC offered conflicting Plans of Arrangement, but they signed a single joint Disclosure Statement. The Committee's Plan won acceptance and confirmation. But ICC remained as debtor in possession to facilitate the distribution. The same complexity in miniature governs the case against Lewis. ICC's attorney signed the Complaint against Lewis. Ferree signed the Application, as attorney for the Committee, but the Application bore typed signature blocks of both the Committee and ICC. Ferree handled the settlement negotiations, and when the matter came up again three months later, it was Ferree who raised the issue, in a letter to Lewis' attorney. But it was ICC's attorney who got the court to issue the summons, and who has pursued this lawsuit.

Taking all things together then, it seems clear that Ferree was acting in this matter both for the Committee and ICC. Having established that Ferree was the responsible agent, I turn next to ICC's second point. ICC argues that, even assuming agency, still the parties never really meant to dispose of the matter when Lewis turned over the list. According to ICC, all Lewis got in exchange for his list was that ICC took the matter off calendar, reserving the right to raise the issue again if, as, and when it chose. Putting the best face possible on the matter, ICC is correct that there never was any formal disposition—no document called "accord and satisfaction," for example, or "release." Things might have been spelled out more carefully. But this point cuts both ways. For suppose ICC had written up a document saying: "In exchange for your surrendering the customer list, we agree to take the matter off calendar—but we reserve the right to put it back on again

at any time, for any reason, as we see fit." It is inconceivable that Lewis would have surrendered the customer list on that basis. In any event, there is uncontradicted dispositive evidence on the point. It is in the letter from Ferree, reopening the issue in January. Ferree recalls that

"(T)his matter was resolved by our taking off calendar the Application in exchange for Mr. Lewis' agreement to provide the names and addresses of certain purchase entities.... Mr. Lewis performed his part of the agreement. We have been informed by Logic Technology that the information provided is not sufficient for its purpose and they need to have copies of all the purchase orders obtained by Mr. Lewis...."

I think the operative word here is "resolved." Clearly, Ferree, who acted for ICC in the matter, thought the issue was over and done with when Lewis surrendered the list. The fact that Logic (who, strictly speaking, was not even a party) later repented of the deal—that fact alone is without consequence.

Lewis supports his summary judgment motion with two declarations from his own lawyers consistent with this account of the events. While these alone probably are not dispositive, they certainly add weight to his story. And perhaps more important, there is nothing in any of the counter-declarations to undermine the point. ICC is left only with the brief of its own attorney (not Ferree) to the effect that no "right thinking attorney" would read the record this way.

At least in part, the confusion here may arise from the confusing nature of bankruptcy procedure. ICC's "Complaint" in this matter triggered an "adversary proceeding"—a formal subset of the bankruptcy case, with a relatively clear-cut conceptual identity. See former Bankruptcy Rule 701, cf., present Bankruptcy Rule 7001. The judge's "Marathon" order put the Complaint in limbo. The subsequent "Application," though covering essentially the same matter, was a beast of indeterminate provenance, functionally a part of the adversary proceeding, but technically a part of the main bankruptcy case. See former Bankruptcy Rules 901(4) and (9). In an ordinary trial court, ICC might well have had difficulty getting on calendar twice with the same matter in two different forms. The complexity of bankruptcy procedure may have its virtues. But it should not be permitted to give ICC two chances at the same relief.

ICC also argues that the September agreement, if any, was not binding because Lewis gave up nothing. That is, ICC said it already had all the information in Lewis' customer list. Assuming, *arguendo,* that this is true, still it is beside the point. It is clear both parties, at the time they reached their accord, acted as if they believed they were compromising a good-faith dispute. Taking that view of things, it does not matter if the consideration might have turned out in retrospect to be worthless. *Potter v. Pacific Coast Lumber Co.,* 37 Cal.2d 592, 234 P.2d 16 (1951).

Since I find that Lewis prevails as a result of the September compromise, it is appropriate also to note that the compromise arose out of the subcontract between Lewis and ICC. I note also that the subcontract includes a clause providing for attorneys' fees to the prevailing party in any resultant litigation. Therefore, pursuant to the contract, and pursuant also to Cal.Civ. Code § 1717 (West 1983), reasonable attorneys' fees will be awarded to Lewis on the appropriate notice and motion.

IV

There is another matter that needs to be noted here—though, as I intend to show, it is not central to the case. That is the question of the validity, under the Bankruptcy Code, of the original subcontract agreement. Both parties concede that the original subcontract was consummated without notice and a hearing. See Bankruptcy Code § 102, 11 U.S.C. § 102 (Supp. IV 1981); *In re Sullivan Ford Sales,* 2 B.R. 350 (Bkrtcy.D.Me.1980); *In re Stanley Hotel, Inc.,* 15 B.R. 660 (Bkrtcy.D.Colo.1981). The Code provides that the debtor in pos-

session may transfer property of the estate without notice and a hearing if he does so in the ordinary course of business. He may also transfer outside the ordinary course of business, but only after notice and a hearing. Compare Bankruptcy Code § 363(c), 11 U.S.C. § 363(c) (Supp. IV 1981), with Bankruptcy Code § 363(b), 11 U.S.C. § 363(b) (Supp. IV 1981). We can assume for purposes of analysis that the Abacus line was "property of the estate." Correspondingly, we can assume that ICC, as debtor in possession, was making a "transfer" of "property of the estate." Lewis, in defense of the subcontract and of his own conduct, argues that the transaction was lawful because it was in the ordinary course of business. Lewis argues further that all parties had knowledge, and that in any event ICC is now estopped to raise the issue.

ICC's argument is somewhat more ingenious. It argues that the transaction was in the ordinary course of business—and thus permissible under Bankruptcy Code § 363(b), 11 U.S.C. § 363(b) (Supp. IV 1981) —if and only if ICC's interpretation of the agreement is correct. ICC argues that if Lewis is correct, then the agreement is outside the ordinary course and unlawful.

■ I find myself uncomfortable with both interpretations. From this vantage, it appears to me that the transaction was not in the ordinary course. Cf., e.g., In re WFDR, Inc., 10 B.R. 109 (Bkrtcy.N.D.Ga. 1981); In re First International Services Corp., 25 B.R. 66 (Bkrtcy.D.Conn.1982); In re Frank, 27 B.R. 748 (Bkrtcy.S.D.Ohio 1983). Hence, it would appear to require notice and a hearing. Moreover, I do not think it is wise to endorse any flexible standard of "estoppel" or "notice by custom." But on this issue, it seems to me the facts of this case are somewhat unusual. There is, first of all, the fact that a Plan has already been confirmed. There is further the fact of the unusually extensive Committee participation in this case. And finally, there is the fact that the only party raising the issue was itself a party to the suspect agreement. Under these rather

special circumstances, I find, not that the transaction was valid at the outset, but that the issue is now moot.

Finally, I need to say a word about jurisdiction. At an early stage of this proceeding, Lewis objected that this Court did not have jurisdiction over this case. Lewis did not press the jurisdictional argument at the hearing on the motion for summary judgment, but I raised the issue sua sponte, asking each counsel to provide a supplemental memorandum on jurisdiction, in light of Northern Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Counsel for Lewis, in a very helpful memorandum, now advises that this Court has jurisdiction. Counsel takes the position that this Court is governed by the Local Rule Governing Bankruptcy Cases and Proceedings ("Emergency Resolution") adopted by the United States District Court for the Central District of California. He argues that this is a "related matter" under the Emergency Resolution, in which I can give judgment if the parties consent. See Emergency Resolution § (d)(3)(B). He further advises that Lewis now withdraws his prior objection to jurisdiction and so concludes that I may give judgment.

ICC in its memorandum agrees that this is a related matter under § (d)(3)(B). But ICC, having brought the original lawsuit, in its memorandum now informs me that it does not consent to my giving judgment. ICC thus concludes that I cannot give judgment, but must submit a proposed judgment to the District Court.

■ Helpful as counsel was in this matter, I take a third view. That is, I hold that this is a so-called "core matter" in which I can give judgment whether or not there is consent. Emergency Resolution §§ (d)(2) to (d)(3)(A). It seems to me that this action is, in essence, an action to force turnover of property alleged to be property of the estate. While there are other claims for relief, they seem to me to be ancillary to the turnover claim and, as such, it seems to me precisely the sort of action specified by § (d)(3)(A) as within my jurisdiction. In

any event, the Emergency Resolution itself provides that the parties may have *de novo* review, obviating any problem that may arise under *Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.,* 712 F.2d 1305 (9th Cir.1983). *See* Emergency Resolution § (e)(2)(B).

This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052. Judgment shall be entered dismissing the complaint and awarding costs and attorneys' fees to the defendant.